William H. LUNDIN, Kathleen R. Lundin and Steven J. Lundin, Plaintiffs-Respondents and Cross-Appellants,

v.

Gregg T. SHIMANSKI, Defendant and Third-Party Plaintiff-Appellant and Cross-Respondent-Petitioner,

STAUTER REALTY SERVICE, INC. and Gail Rosenvold, Defendants and Third-Party Defendants.

Supreme Court

*No. 83–620. Argued April 30, 1985.—Decided June 5, 1985.*

(Also reported in 368 N.W.2d 676.)

176

177

For the petitioner there were briefs by *Tod B. Linstroth, Ann Ustad Smith* and *Michael, Best & Friedrich,* Madison, and oral argument by *Ms. Smith.*

For the plaintiffs-respondents and cross-appellants there was a brief by *Russell W. Devitt* and *Soffa & Devitt,* Whitewater, and oral argument by *Russell W. Devitt.*

LOUIS J. CECI, J. This is a review of an unpublished decision of the court of appeals filed on September 11, 1984, affirming a judgment of the circuit court for Dane county, W. L. Jackman, reserve judge, presiding. The court of appeals held that credible evidence supports the jury's findings of intentional misrepresentations on the part of Gregg T. Shimanski (defendant) and the award for benefit of the bargain damages and punitive damages. We agree and, therefore, affirm the court of appeals decision.

This action arises out of a real estate transaction between the Lundins (plaintiffs) and Shimanski. William and Kathleen Lundin were interested in purchasing rental property which, besides producing income, would provide a place for their son, Steven, to live in while

attending the University of Wisconsin in Madison. The Lundins contacted Stauter Realty, a real estate agency, for assistance in locating suitable property. Gail Rosenvold, sales agent for Stauter Realty, discovered a classified advertisement for a house which appeared to satisfy the needs of the plaintiffs. The advertisement publicized a three- to four-bedroom house with a "possible rental unit in lower level." Rosenvold contacted the owner of the house, Shimanski, and arranged to show it to the Lundins. Shimanski is by occupation a real estate broker and personally owns various properties for investment purposes. Shimanski informed Rosenvold that the property was zoned R4A, that five female college students were renting the house for $450 a month, and that a conditional use permit would have to be obtained from the city of Madison if the Lundins were interested in having Steven occupy the basement. These assertions are all true.

On Saturday, November 26, 1977, Rosenvold met with Dr. and Mrs. Lundin to show them Shimanski's property. Shimanski was not present. The information that had been provided by the defendant to Rosenvold was at that time relayed to the Lundins by Rosenvold. The house appeared to fit the two conditions set by the plaintiffs. They examined the basement, which apparently had been lived in at one time. They determined that the basement unit would be suitable for Steven. Additionally, there were three bedrooms upstairs that were available as rental units.

Immediately following this inspection, the Lundins went to Stauter Realty, where Rosenvold prepared an offer to purchase. The buyers were listed on the offer as William, Kathleen, and Steven Lundin. On Monday, November 28, 1977, the offer was conveyed to the defendant and accepted by him. The offer to purchase provided that "[p]hysical occupancy of basement shall

be given to Buyer on Jan. 15, 1978." Additionally, the offer indicated that the premises were occupied by tenants under a written lease effective through August, 1978.

The real estate closing took place on December 16, 1977, at the offices of Stauter Realty. Present were Dr. and Mrs. Lundin and their attorney; Shimanski and his attorney; Gail Rosenvold; and Ron Stauter, president of Stauter Realty. Shimanski told the plaintiffs that they would have to obtain a conditional use permit in order for Steven to use the basement as a dwelling unit. The closing statement, which was prepared by the plaintiffs' attorney from his notes at the closing, states, "Can live in basement—is acceptable to city—just apply for conditional use." Shimanski prepared the Wisconsin real estate transfer return form, which indicates that the property had more than one unit. Additionally, Shimanski asserted that the property was zoned R4 and assigned the lease covering the property to the plaintiffs.

Following the closing, the Lundins spent approximately $3,000 in improvements in the basement. They did not apply for a conditional use permit. On February 9, 1978, the Madison building inspector posted a notice on the premises, prohibiting Steven's occupancy of the basement, because the unit was being illegally used. The Lundins received an official notice from the building inspector on February 14, 1978, informing them of two code violations. The first item concerned the occupancy of the five unrelated tenants. Due to the fact that the property was located in an R4A district and not owner occupied,[1] occupancy was restricted by code to a maximum of two unrelated persons (a family plus one roomer).

---

[1] The notice stated that "[t]o be owner occupied the person or persons on the deed must all reside on the property."

The second violation involved the use of the basement as a dwelling unit. Steven was ordered to immediately discontinue his occupancy of the basement, because the plaintiffs had not obtained a conditional use permit which was required to convert the property into a two-unit building. The plaintiffs were advised that they would have to apply for a zoning variance before they could obtain a permit; however, the variance was denied.

The Lundins commenced this case on August 22, 1979, alleging that the defendants falsely and fraudulently represented that the premises were capable of being rented for income production and that the basement was capable of being occupied. The plaintiffs contend that they relied on these misrepresentations and, in doing so, were induced to purchase the property.

Trial to a six-person jury commenced on November 29, 1982. The jury returned a special verdict on December 6, 1982, finding:

(1) On or before November 28, 1977,[2] and on December 16, 1977,[3] Shimanski made untrue representations of fact to the plaintiffs, or to Gail Rosenvold, with respect to the property in question, knowing that they were untrue or recklessly without caring if they were untrue, and with intent to deceive and induce the plaintiffs to act on them.

(2) Plaintiffs believed such untrue representations and justifiably relied on them to their pecuniary damage.

(3) Gail Rosenvold did not make untrue representations of fact to the plaintiffs with respect to the property in question.

(4) As of December 16, 1977, the difference between the market value of the property as it actually existed and as it was represented was $3,800.

---

[2] On November 28, 1977, Shimanski accepted the offer to purchase.

[3] On December 16, 1977, the real estate closing transpired.

(5) The sum of $3,780 would fairly and reasonably compensate the plaintiffs for their inability to use the property as they intended when they purchased the property.

(6) The representations by Shimanski were made in a malicious or wanton, willful or reckless disregard of the plaintiffs' rights, and the sum of $5,000 would be proper under the circumstances for punitive damages.

(7) The plaintiffs were not justified in remodeling the basement when they did.

On motions after verdict, the trial court affirmed the jury's finding of Shimanski's liability, but reversed the jury's award for lost use damages. The trial court was of the opinion that the jury had grounds for its finding of misrepresentations of fact made by the defendant, given that Shimanski was fully aware at the time of the sale that the occupancy of the five unrelated tenants was in violation of the city code. Although Shimanski had given the proper zoning classification to Rosenvold (R4A), he misstated the classification at the closing (R4). Shimanski never disclosed to the plaintiffs that prior to the sale the city had raised objections to the occupancy of the five tenants. Additionally, with respect to the lost use damages, the trial court concluded that the plaintiffs made no effort to mitigate their damages for lost rents. The court stated, "[T]he evidence shows that plaintiffs made no effort to maximize the rental return of the house, but on the contrary did minimize the return by accepting minimal rentals." Judgment against Shimanski was entered in the sum of $8,800 plus costs and disbursements.

Shimanski then appealed the judgment against him, and the plaintiffs cross-appealed the portion of the judgment striking the jury's award for lost use damages. The court of appeals affirmed the trial court but, in do-

ing so, voiced disagreement with the trial court's finding of liability with respect to the illegal occupancy of the five tenants. The court of appeals determined that at the time of the sale Rosenvold knew that the upstairs occupancy did not conform to the zoning requirements. The court concluded that Rosenvold was the agent of the Lundins and, consequently, imputed her knowledge to the plaintiffs. Given this knowledge, the Lundins could not justifiably rely on any contrary misrepresentation made by Shimanski. In any regard, the court of appeals did determine that the Lundins were misled about the conditional use permit with respect to the basement unit. Shimanski did inform Rosenvold and the Lundins that a conditional use permit was necessary, but he misrepresented the ease in obtaining the permit. The court concluded that there is evidence that Shimanski indicated that there was no problem in obtaining the permit and that it was a mere formality. The Lundins and Rosenvold had no knowledge to the contrary. In so finding, the court of appeals held that Shimanski intentionally misrepresented that the property was easily convertible into two units, when he knew this to be false.

Shimanski now appeals the court of appeals decision. Since the plaintiffs have not pursued their cross-appeal, the remaining issues before this court are as follows:

(1) Whether there is any credible evidence to support the jury's finding of intentional misrepresentation on the part of Shimanski.

(2) Whether Shimanski's misrepresentations give rise to a legally cognizable action under the laws of this state.

(3) Whether there is any credible evidence to support the jury's damage award.

I.

The elements of a claim for intentional misrepresentation are well established in this state: first, there must be a false representation of fact; second, it must be made with intent to defraud and for the purpose of inducing another to act upon it; third, such other person must rely on it and thereby be induced to act, to his own injury or damage. *See, Williams v. Rank & Son Buick, Inc.*, 44 Wis. 2d 239, 242, 170 N.W.2d 807 (1969), and *Goerke v. Vojvodich*, 67 Wis. 2d 102, 107, 226 N.W.2d 211 (1975). "In intentional deceit the defendant must either know the representation is untrue or the representation was made recklessly without caring whether it was true or false . . . ." *Whipp v. Iverson*, 43 Wis. 2d 166, 169, 168 N.W.2d 201 (1969), quoted in *Ollerman v. O'Rourke Co., Inc.*, 94 Wis. 2d 17, 25, 288 N.W.2d 95 (1980). The party alleging the fraud has the burden of proving the elements by clear and convincing evidence. *Williams*, 44 Wis. 2d at 242.

"In reviewing a jury's verdict, the test is whether there is *any* credible evidence in the record on which the jury could have based its decision. The evidence is viewed in the light most favorable to sustain the verdict; we do not look for credible evidence to sustain a verdict the jury could, but did not, reach." *Sumnicht v. Toyota Motor Sales*, 121 Wis. 2d 338, 360, 360 N.W.2d 2 (1984) (emphasis added), citing with approval *D. L. v. Huebner*, 110 Wis. 2d 581, 634, 329 N.W.2d 890 (1983); sec. 805.14 (1), Stats.[4]

---

[4] Section 805.14(1), Stats., provides as follows:

"**805.14 Motions challenging sufficiency of evidence; motions after verdict.** (1) TEST OF SUFFICIENCY OF EVIDENCE. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there

After a thorough review of the trial transcript, we are convinced that there is credible evidence that Shimanski intentionally misrepresented the property in question to the plaintiffs in two separate respects.

### A. *Conditional Use Permit*

First, we review whether there was sufficient testimony adduced at trial from which the jury could have concluded that the defendant misrepresented the ease of obtaining the conditional use permit. There is no question here that Shimanski knew that the Lundins purchased the property with the purpose of having Steven live in the basement. This was conveyed to the defendant by Rosenvold and was in the offer to purchase which Shimanski accepted. Additionally, there is sufficient credible evidence that Shimanski represented that there would be no problem in obtaining the conditional use permit so that Steven could live in the basement. Rosenvold testified that the defendant conveyed to her that, although some improvements had to be done on the basement, it was standard procedure to obtain the permit. This impression was passed along to the plaintiffs. Dr. Lundin testified that Shimanski's act of accepting the offer to purchase reassured him that there was no problem with Steven's living in the basement.[5]

---

is no credible evidence to sustain a finding in favor of such party."

[5] A misrepresentation can be conveyed by one's actions as well as by spoken words. This court has held,

"It is not necessary for a person to make oral misrepresentation of fact in order to be guilty of fraudulent conduct,—such representations may be made by the acts or conduct of the party. The rule is stated in 1 Bigelow, Fraud, p. 467:

"'Any conduct capable of being turned into a statement of fact is a representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts.'" *Scandrett v. Greenhouse,* 244 Wis. 108, 113, 11

The offer to purchase stated that the plaintiffs were to receive physical occupancy of the basement on January 15, 1978. Additionally, Dr. Lundin stated that at the closing[6] he was informed that all he had to do to obtain the permit was to pick it up. He thought the procedure was no different than picking up a dog license. Mrs. Lundin also testified that at the closing, the defendant told her that the permit was all taken care of and they could just pick it up. Finally, the closing papers indicate that there was no problem with occupancy in the basement. The real estate transfer return reflects that the residence had more than one unit, and the closing statement reads, "Can live in basement—is acceptable to city —just apply for conditional use."

Although Shimanski contends that he never expressly represented or implied that the occupancy permit merely had to be picked up, or that it was standard procedure to obtain the permit, " '[t]he credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment.' " *Summicht*, 121 Wis. 2d at 360. (Citations omitted.) In our reading of the

N.W.2d 510 (1943), cited with approval in *Goerke v. Vojvodich*, 67 Wis. 2d at 106–07.

[6] Shimanski argues that whatever transpired at the closing is irrelevant. He contends that his acceptance of the offer to purchase results in a binding contract, and, therefore, at the closing the plaintiffs had no right to rely on any representations that he may have made. *See, Gregory v. Selle*, 58 Wis. 2d 367, 374, 206 N.W.2d 147 (1973), and *Jeffers v. Nysse*, 98 Wis. 2d 543, 545–46, 297 N.W.2d 495 (1980). We disagree with the defendant. In this case, the statements made at the closing are relevant to a finding of intentional misrepresentation. Although the Lundins were bound by their offer to purchase, Shimanski's continuing misrepresentations made at the time of the closing induced the Lundins to conclude the purchase. We agree with the plaintiffs that if they would have been aware of the true nature of the property they could have pursued other equitable remedies instead of closing on the property. *See, Whipp v. Iverson*, 43 Wis. 2d 166, regarding rescission of contracts.

transcript, we find numerous, substantial inconsistencies and inaccuracies in Shimanski's testimony. Given the verdict in this case, it is clear that the jury chose to believe the plaintiffs' testimony concerning what transpired and not the testimony of the defendant. We are not in a position to substitute our judgment for that of the jury with respect to this issue of credibility, and, therefore, hold that there is credible evidence that Shimanski misrepresented the ease of obtaining the permit.

Shimanski next argues that he did not know that his representations were false and, therefore, that they were not made with the intent to defraud the Lundins and induce them to purchase the property. This assertion is not supported by the record. We have no hesitancy in holding that there is substantial evidence which shows that the defendant did have complete knowledge of the difficulties in obtaining a conditional use permit.

Shimanski purchased the property in question in January, 1977. In February, 1977, the premises were inspected by a city building inspector, and Shimanski was subsequently cited with seven code violations. The official notice informed the defendant that the occupancy in the basement was in violation of the code, and he was ordered to "[d]iscontinue the use of the basement for living or sleeping purposes or apply for and obtain a conditional use." The date of compliance with the notice was set for May 26, 1977.

On May 19, 1977, Shimanski sent the building inspection department a letter requesting approval for his basement tenant to continue to occupy the basement until August 15, 1977. In June, he met with two employees of the department to discuss what improvements were required in the basement before he could obtain a permit. Shimanski determined that the costs of the necessary improvements would be between $1,000 and $4,000.[7] He never made the improvements in the basement and never applied for a permit.

Shimanski became aware of the procedure for obtaining a permit in June, 1977, when he submitted plans for two permits for two other parcels of property that he owned. Shimanski admitted at trial that the procedure for obtaining a permit is more involved than merely going to city hall and picking up the permit. With respect to the two permits he did obtain, Shimanski had to be in full compliance with the code; he was required to file a cover sheet, an application, and a set of plans; and it was necessary for him to appear at a public hearing.

In sum, we conclude that Shimanski, through his words and actions, misrepresented to the Lundins that there would be no problem in obtaining a permit so that Steven could live in the basement, when he knew that obtaining a permit was an involved process. At all times pertinent to this transaction, Shimanski knew that occupancy of the lower level would violate the city code. We hold that there was sufficient credible evidence adduced at trial from which the jury could have found that the misrepresentation concerning use of the basement was made with the intent to defraud the Lundins and induce them to purchase the property.

### B. *Upstairs Rental*

We now turn to the allegation that the defendant misrepresented that the upper unit was legally rented to five unrelated tenants. It is not disputed that Shimanski knew that the Lundins intended to continue the rental of the upstairs. When asked about the zoning classification, the defendant correctly informed Rosenvold that

[7] Shimanski's nondisclosure of the extensiveness of the necessary improvements does not appear to be relevant in this case, since the Lundins did on their own invest approximately $3,000 in improvements in the basement.

the property was zoned R4A. Rosenvold testified that she knew that the tenancies did not conform with the zoning requirements but failed to inform the Lundins of this violation because Shimanski gave her the impression that the zoning violation did not create a problem.[8]

The Lundins testified that when they first inspected the home, Rosenvold informed them that the property was occupied by five women who collectively paid $450 a month and that the tenants' lease ran through August,

[8] We decline to impute Rosenvold's knowledge to the Lundins and reverse the court of appeals' holding that Rosenvold was the agent of the Lundins. Whether an agency relationship exists turns on several factors. It is unclear from the court of appeals' decision what factors it relied on in making a finding that Rosenvold was the agent of the plaintiffs. It appears that the court of appeals did not consider the fact that Rosenvold, as a sales agent of Stauter Realty, received a commission, paid by Shimanski, that compensated her for her efforts in selling the property. Compare, Haislmaier v. Zache, 25 Wis. 2d 376, 384–85, 130 N.W.2d 801 (1964); Hilboldt v. Wisconsin R.E. Brokers' Board, 28 Wis. 2d 474, 483–85, 137 N.W.2d 482 (1965); Pavalon v. Fishman, 30 Wis. 2d 228, 235–36, 140 N.W.2d 263 (1966); and Hercules v. Robedeaux, Inc., 110 Wis. 2d 369, 373–74, 329 N.W.2d 240 (Ct. App. 1982). Additionally, the agency issue has not been waived by the plaintiffs' failure to cross-appeal the court of appeals' finding of an agency relationship. Correction of this error concerning the issue of agency would only further sustain the court of appeals' favorable holding for the plaintiffs. Hence, the plaintiffs by common law are entitled to review of this claimed error by raising the issue in their brief without filing a cross-appeal. See, State v. Alles, 106 Wis. 2d 368, 316 N.W.2d 378 (1982), citing Slaughter v. Bernards, 97 Wis. 184, 196, 72 N.W. 977 (1897), as follows:

" 'We are not bound on this appeal by the findings and conclusions unfavorable to respondent, but may properly review the whole case and affirm the judgment though errors be found, if, notwithstanding, the judgment be right on the pleadings and the evidence.' " Alles at 391. See also, Auric v. Continental Cas. Co., 111 Wis. 2d 507, 516, 331 N.W.2d 325 (1983), and State v. Strege, 116 Wis. 2d 477, 492–93, 343 N.W.2d 100 (1984).

1978. The record is unclear as to when the plaintiffs were first informed that the property was zoned R4A; however, it was apparently some time prior to the closing. The Lundins testified that they were unaware of the legal ramifications of this zoning classification and, instead, relied on the defendant's acceptance of the offer to purchase which stated that the tenants' lease was effective through August, 1978.

Additionally, misrepresentations were made at the closing that the property was legally rented to five unrelated tenants. The plaintiffs were represented by an attorney at the closing. The plaintiffs' attorney testified that when he questioned Shimanski about the zoning classification, Shimanski incorrectly stated that the property was zoned R4. This is reflected in the closing statement, which reads, "Zoning R–4." Further, Shimanski assigned the tenants' lease to the Lundins. Based on these facts, we hold that there is sufficient credible evidence to conclude that Shimanski, through his words and actions, misrepresented that the upper unit was legally rented to the five unrelated tenants.

We also conclude that at all times pertinent to this case, Shimanski was well aware of the fact that the property could not legally be inhabited by more than one family, plus one unrelated person. The official notice from the city building inspector that was received by the defendant in March, 1977, informed Shimanski that the property was in an area zoned R4A and that it must not be inhabited by more than a family plus one person. Shimanski wrote the building inspection department on May 19, 1977, stating that the upstairs unit was rented to a *family* effective August, 1977. However, contrary to this letter, Shimanski had entered into a lease in May, 1977, with the five unrelated women

who were the tenants of the upper unit at the time the Lundins purchased the property. This lease was to expire in August, 1978. This lease, that Shimanski knew was illegal, was assigned to the Lundins at the closing. Based on this evidence, we conclude that there was sufficient credible evidence adduced at trial from which the jury could find that Shimanski intentionally and fraudulently represented to the Lundins that they could legally continue leasing the upper unit to the five women and that this misrepresentation induced the plaintiffs to purchase the property.

In viewing this case as a whole, it is clear to this court that there is sufficient evidence that the jury could conclude that Shimanski misrepresented the suitable use of the property in question. The Lundins correctly assert that they sought to purchase a house where the basement unit could be occupied by their son and where the upper unit could be rented for income purposes to existing tenants. The Lundins were unable to obtain either of these goals. Within two months of the real estate closing, Steven was ordered to vacate the basement and the plaintiffs were ordered to reduce the occupancy of the upper unit. The plaintiffs' application for a zoning variance was denied, and they were not able to obtain a permit.[9] As such, we affirm the jury's finding of misrepresentation on the part of Shimanski.

## II.

Shimanski argues that even if he did in fact misrepresent the permitted uses of the property, his misrepresentations do not give rise to a legally cognizable action

---

[9] We note that the zoning variance was denied because the lot was undersized for two units. The fact that the lot was undersized was unknown to the defendant at the time of the sale. In any regard, the defendant's misrepresentations were relied on by the plaintiffs and did induce them to purchase the property.

under the laws of Wisconsin. This issue was not discussed in the decisions of the trial court or court of appeals. After reviewing the relevant case law, we hold that the plaintiffs' claim is not barred by the law of this state.

Shimanski asserts that his statements constitute either nonactionable opinions or representations about future events. The general rule is that, in actions for fraudulent misrepresentations, "the representations must relate to present or pre-existing facts . . . ." *Alropa Corp. v. Flatley*, 226 Wis. 561, 565–66, 277 N.W. 108 (1938).

" 'Ordinarily a prediction as to events to occur in the future is to be regarded as a statement of opinion only, on which the adverse party has no right to rely.' " *Hartwig v. Bitter*, 29 Wis. 2d 653, 657, 139 N.W.2d 644 (1966), quoting Prosser, *Law of Torts*, sec. 104 at 744 (hornbook series, 3d ed.).

An example of the "pre-existing fact" rule is evidenced in *Alropa*, 226 Wis. 561, where this court denied liability, holding that representations with respect to future public improvements relate "to a future state of facts and not to a then presently existing condition." *Id.* at 565.

An exception to the general rule stated above is that statements of opinion are actionable if the speaker knows of facts incompatible with his opinion. *Alropa*, 226 Wis. at 566; *Zingale v. Mills Novelty Co.*, 244 Wis. 144, 150–51, 11 N.W.2d 644 (1943); and *Hartwig*, 29 Wis. 2d at 656–57. The *Zingale* case is very helpful in resolving the issue at hand. *Zingale* involved an alleged misrepresentation with respect to a large ice cream manufacturing unit. Zingale "had no knowledge or experience in the manufacture of ice cream." *Id.* at 146. At the urging of Somers, a salesman for the defendant corporation,

Zingale purchased a large ice cream unit. Somers had examined Zingale's premises and determined that a small stockroom "would be an ideal location to manufacture ice cream." *Id.* at 147. Three months after Zingale commenced operation, state and city authorities ordered the plaintiff to discontinue his operation unless extensive alterations were made. The plaintiff could not make the required changes, and he discontinued manufacturing ice cream.

Zingale commenced suit for damages for fraud in making false representations as to the eligibility of the stockroom for the manufacture of ice cream. Somers admitted that he knew at the time of the sale that the room was objectionable. Judgment was awarded to Zingale, and the defendant appealed. This court's affirmance of the jury verdict was based on the following rule:

" 'A statement of opinion in a business transaction upon facts not disclosed or otherwise known to the recipient may reasonably be interpreted as an *implied statement that the maker knows of no fact incompatible with his opinion. . . .*' " *Id.* at 150, citing Restatement, 3 Torts, sec. 539 at 91. (Emphasis added.)

We held,

"Respondent had a right to believe from the statements made by appellant's agents that the room in question was suitable and proper to be used for the manufacture of ice cream and that nothing more would be required than a coat of paint and some linoleum. This was very important to him in making his decision, and it was evident to the agents of appellant that alterations and changes as required by the proper authorities could not be made and the building remain suitable for the general purposes for which it was being used. *Whether this may be said to be a deliberate withholding of a statement of facts or whether it may be interpreted as an implied statement does not change the result.*" *Zingale* at 150–51. (Emphasis added.)

In the case at hand, Shimanski, like the defendant in *Zingale*, made representations with respect to the suitable use of the property. First, Shimanski was specifically questioned about converting the basement into a second unit. Through his words and actions, he misrepresented to the Lundins that there would be no problem in obtaining the necessary conditional use permit.[10] Although we recognize that Shimanski's representations were statements of opinion concerning how the city would handle the permit application, which under the "pre-existing fact" rule would be nonactionable, there is sufficient evidence that Shimanski knew of facts incompatible with his opinion. That being the case, we hold that the Lundins had a right to rely on Shimanski's assertions, and their claim is not barred by the "pre-existing fact" rule stated in *Alropa*, 226 Wis. at 565–66.

Second, Shimanski was also questioned about the zoning classification regarding the rental of the upper unit. Through his words and actions, he misrepresented to the plaintiffs both the zoning classification and the fact that the property was legally rented to the five women.[11] This is a statement of present fact and, therefore, in compliance with the "pre-existing fact" rule.

In conclusion, we hold that Shimanski's misrepresentations do give rise to a legally cognizable action under *Alropa* and *Zingale*. The defendant represented to the Lundins that they were purchasing property where the basement could easily be converted into a second unit and where the upper unit was legally rented to the five existing tenants. At all times pertinent to the sale, Shimanski knew these statements were false, and, pur-

---

[10] *See*, section 1.A. of this opinion.

[11] *See*, section 1.B. of this opinion.

suant to the law of this state, the Lundins had a right to rely on his assertions.[12]

### III.

The final argument espoused by the defendant is that the plaintiffs failed to prove any damages.[13]

"The general rule for appellate review of damage awards, as for other factual questions, is that any credible evidence of the damage claimed is sufficient to sustain the jury's award." *Gyldenvand v. Schroeder,* 90 Wis. 2d 690, 697, 280 N.W.2d 235 (1979), citing *Roach v. Keane,* 73 Wis. 2d 524, 539, 243 N.W.2d 508 (1976).

The measure of damages in cases of fraudulent misrepresentation is the "benefit of the bargain" rule. *Anderson v. Tri-State Home Improvement Co.,* 268 Wis. 455, 464–464a, 67 N.W.2d 853, 68 N.W.2d 705 (1955).

"Under the benefit of the bargain rule, the measure of the purchaser's damages is typically stated as the difference between the value of the property as represented and its actual value as purchased." *Ollerman,* 94 Wis. 2d at 52–53. (Footnote omitted.)

At trial, the Lundins' real estate appraiser was asked a hypothetical question regarding the value of the property as it was represented as a two-unit building, compared to the value of the property as a single-family residence. The appraiser was of the opinion that the

---

[12] Because we conclude that Shimanski is liable for active fraud by means of his words and actions, we need not reach the issue of whether Shimanski's silence constitutes fraud under *Ollerman v. O'Rourke,* 94 Wis. 2d 17.

[13] Shimanski does not argue that the jury award is excessive. *See, Cords v. Anderson,* 80 Wis. 2d 525, 552–54, 259 N.W.2d 672 (1977), and the cases cited therein.

increase in value of a two-unit over a one-unit would be between $5,000 and $6,000.

Shimanski argues that this hypothetical question was improper because he never represented the property as having two units. He claims that he always presented the property as a single-family house for which a conditional use permit would be required to convert the basement into a second dwelling unit. This assertion is not supported by the record. First, the real estate transfer return discloses that the property has two through seven rental units. Second, Shimanski represented that Steven could live in the basement and that it was acceptable to the city.

As we held above, Shimanski misrepresented the suitable use of the property. The plaintiffs were unable to use the basement as a unit for Steven. The lost use of this basement unit is what constitutes the Lundins' damages. There is credible evidence to support the jury's finding that the difference in the value of the property as represented and as acquired is $3,800.

Shimanski's final argument is that the jury's award for punitive damages is not supported by credible evidence. In appropriate cases, punitive damages may be awarded for intentional misrepresentation. We have held,

"[P]unitive damages may be awarded where a fraudulent representation is made and relied on to induce a contract in willful, wanton, or reckless disregard of the plaintiff's rights." *Jeffers v. Nysse*, 98 Wis. 2d at 553.

Factors to be considered in determining whether punitive damages should be awarded are "the grievousness of defendant's act, the outrageousness of his conduct and the 'degree of malicious intention.'" *Herrmeyer v. Kleeman*, 76 Wis. 2d 410, 414–15, 251 N.W.2d 445 (1977)

(footnote omitted). However, the element of intent is not a prerequisite to the recovery of punitive damages.

"This court has not required proof of an intentional desire to injure, vex or annoy, or proof of malice, in order to sustain an award for punitive damages. '[M]al-ice or vindictiveness are not the *sine qua non* of punitive damages.' *Kink v. Combs*, 28 Wis. 2d 65, 79, 135 N.W.2d 789 (1965). It is sufficient if the injured party shows a reckless indifference to or disregard of the rights of others on the part of the wrongdoer. 'Reckless indifference to the rights of others and conscious action in deliberate disregard of them . . . may provide the necessary state of mind to justify punitive damages.' 4 Restatement (Second) of Torts sec. 908, comment b, p. 465 (1977)." *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 267, 294 N.W.2d 437 (1980).[14]

In applying these standards to the facts in this case, we hold that there is sufficient credible evidence to sustain the jury's award of punitive damages. At all times pertinent to this case, Shimanski had full knowl-edge that the tenancies of the upper unit and basement unit were in violation of the city code. It is not dis-puted that the defendant was completely aware of the Lundins' intent to continue renting the upper unit to

---

[14] Professors Ghiardi and Kircher explain that conduct justify-ing punitive damages is generally of two distinct types.

"The first type is that in which the defendant desires to cause the harm sustained by the plaintiff, or believes that the harm is substantially certain to follow his conduct. With the second type of conduct the defendant knows, or should have reason to know, not only that his conduct creates an unreasonable risk of harm, but also that there is a strong probability, although not a sub-stantial certainty, that the harm will result but, nevertheless, he proceeds with his conduct in reckless or conscious disregard of the consequences. Neither form of conduct, therefore, involves mere inadvertence or what, in the traditional tort sense, would be called ordinary negligence." J. Ghiardi and J. Kircher, *Punitive Dam-ages Law and Practice*, ch. 5, sec. 5.01 at 8–9 (1984). (Foot-notes omitted.)

the five tenants and to have Steven live in the basement while he attended the university. Shimanski's misrepresentations began when he was first contacted by Rosenvold and continued through the real estate closing. The jury found that Shimanski intentionally and fraudulently misrepresented the property with the intent to induce the Lundins to purchase the property.

We conclude that the jury could have reasonably found that Shimanski's desire to sell the property motivated him to misrepresent the suitable use of the property. Additionally, the damages to the plaintiffs were substantial. Steven was required to discontinue his occupancy of the basement in the middle of his semester at school, and the plaintiffs were left with a partially completed basement that they could not use as they had anticipated. Further, the plaintiffs were ordered to terminate the tenancies of the five women who were renting the upper unit. In sum, the Lundins were precluded from using the property in the manner for which the property was purchased.

While Shimanski's conduct may not have been "malicious" or "vindictive," this court has no difficulty in finding that his conduct evidences a reckless disregard for the Lundins' rights. This holding is consistent with *Jeffers,* 98 Wis. 2d 543, and our reasoning in *Jeffers* deserves repeating.

"Punitive damages are awarded to punish wrongdoing. To hold that punitive damages are improper in this case would shield the defendants from any liability beyond the costs of compensating the [plaintiffs] for their costs in putting the house in the condition it was represented to be in originally. But 'putting the cookies back in the jar' when caught is not enough. If that result were reached, sellers could make any misrepresentation necessary to make a sale. If it was not discovered, or was discovered but not pursued, the seller would make a windfall gain. If the fraud were discovered and successfully proven, the seller would only be liable to make

good on his representations. He would suffer no punishment nor would he be deterred from similar conduct in the future." *Id.* at 553.

*By the Court.*—The decision of the court of appeals is affirmed.