COURT OF APPEALS
DECISION
DATED AND FILED

July 2, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP447**

STATE OF WISCONSIN

Cir. Ct. No.  2021CV1294

IN COURT OF APPEALS
DISTRICT II

---

EAGLE SPRING LAKE MANAGEMENT DISTRICT,

    PLAINTIFF-RESPONDENT,

 V.

STEVEN Q. WRUCK,

    DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Waukesha County: MICHAEL J. APRAHAMIAN, Judge. *Affirmed*.

Before Neubauer, Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Steven Q. Wruck appeals from an order granting a motion for summary judgment filed by Eagle Spring Lake Management District (the "District") and denying his motion for summary judgment.   The circuit court granted summary judgment to the District after concluding that a settlement agreement (the "Agreement") entered into by Wruck and the District to resolve a prior lawsuit was enforceable and not subject to reformation.   In this appeal, Wruck argues that the Agreement is not enforceable due to a lack of definiteness in its terms.   In addition, Wruck contends that the court erred in declining to equitably apportion the cost of a study to be performed under the Agreement.   For the reasons explained below, we reject Wruck's arguments and affirm the order.

## BACKGROUND

¶2    Wruck owns three parcels of land on or near Eagle Spring Lake in Waukesha County.   A portion of Wruck's lakefront property forms part of what is known as the Kroll Dam.   The District owns a parcel that abuts Wruck's land and forms the other half of the Kroll Dam.   Approximately one-quarter mile north of the Kroll Dam along the lakeshore sits the Wambold Dam.   Wruck refers to the stretch of lakeshore that includes the two dams as the Wambold Milldam Complex.   According to Wruck, "approximately 330 property owners in the District … enjoy the lake and are subject to taxation by the District."

¶3    In 2015, the Wisconsin Department of Natural Resources (DNR) notified Wruck that his parcels were subject to periodic maintenance and repair under WIS. STAT. § 31.18 (2023-24).[1]   Wruck subsequently filed a lawsuit against

---

[1]  All references to the Wisconsin Statutes are to the 2023-24 version.

the District and the DNR asserting various claims, including a claim seeking a declaratory judgment as to the District's maintenance obligation with respect to Wruck's half of the Kroll Dam. The parties participated in a mediation in November 2019 that resulted in the Agreement at issue in this case. In addition to Wruck, Peter Jensen, the District's President, attended the mediation.

¶4 The Agreement contains the following seven substantive paragraphs:

1. Hold litigation in abeyance only as to Declaratory judgment/injunctive relief in claim 1; dismissal of claims 2-10 and withdrawal of sanctions, both w[ith] prejudice.

2. [Wruck] to have a dam failure analysis performed after receiving previous dam failure analysis from the Eagle lake management district.

3. After review of the Dam Analysis by District and its engineers and DNR parties agree to assess liability of exposure attributable to the Wruck portion of the dam.

4. If appropriate parties would agree to negotiate in good faith relative to a purchase or maintenance agreement of the Wruck land encumbered by the dam.

5. DNR to stake the length of the dam on the Wruck property within a reasonable period of time from today's date to allow for the dam failure analysis to be performed.

6. Reconvene mediation with [the mediator] as soon as the above is accomplished.

7. Wruck agrees to work in good faith with his lender to transfer the "mill race lands" as identified in the complaint to the District. The cost of preparation and recording shall be the sole responsibility of FNTIC. In exchange, the parties agree to review the title/deed for Wruck and update the same to the extent necessary.

The following language appears at the end of the Agreement: "That this [A]greement is final and binding upon any and all parties to this matter, as well as

3

their heirs, successors, and assigns, and is enforceable in any court of law of general jurisdiction per [WIS. STAT. §] 904.085[.]"

¶5 Following mediation, the District provided Wruck with the previous dam failure analysis the DNR had approved in 2002. According to an August 5, 2020 letter from the DNR to Wruck and the District, the parties asked the DNR in March 2020 to "re-evaluate the Dam Failure Analysis (DFA) on file because it assumed a failure of the Wambold Dam …. The question at hand was whether the DFA needed to be revised to also assume a failure of the [Kroll Dam]." In the August 2020 letter, the DNR informed Wruck and the District that certain data upon which the 2002 dam failure analysis was based had become outdated in light of data on "100-year discharges and flood elevations" for Eagle Spring Lake from a 2014 flood insurance study. "These results," the DNR wrote,

> indicate that flows and flood elevations in the effective [flood insurance study] are considerably higher than the results in the DFA, and have invalidated the DFA results currently on file. **As a result, the DFA will need to be re-studied and the spillway capacity of the Wambold Dam will need to be re-evaluated.**

The DNR instructed the parties to resubmit a dam failure analysis which would, among other things, "need to identify the most probable mode of failure, assessing both [the Wambold Dam and the Kroll Dam]."

¶6 Wruck did not obtain a new failure analysis, and the parties were unable to move forward with other aspects of the Agreement. In September 2021, the District commenced this action against Wruck, asserting quiet title and breach of contract claims premised on Wruck's alleged failure to transfer the "mill race lands" to the District as required under paragraph 7 of the Agreement. In its complaint, the District alleged that Wruck had not completed the transfer because

he "hoped that the District would decide to purchase [his lakefront property] to resolve all claims between the parties."

¶7    In April 2022, Wruck's engineer wrote to the District seeking its "preliminary agreement" to purchase the portion of Wruck's property that was ultimately determined to be part of the Kroll Dam. The District declined this request in a May 9, 2022 letter, noting that Wruck had "failed to complete items previously agreed to in [the A]greement" which had caused the District to sue him "to force compliance with the [A]greement."

¶8    Shortly thereafter, Wruck filed an answer to the District's complaint. The answer included, as an affirmative defense, allegations that the Agreement failed because the parties mistakenly believed that the 2002 dam failure analysis remained valid and "because of the District's indefinite and illusory promises that it would act in good faith toward purchasing Mr. Wruck's dam parcel" or assume responsibility for maintaining it. Wruck also asserted a counterclaim, "in the alternative to the court ruling [that] the … [A]greement is unenforceable as written," seeking equitable reformation of the Agreement based upon the parties' alleged mutual mistake concerning the continuing validity of the 2002 dam failure analysis. Wruck asked the court to "equitably apportion the dam failure analysis expense among the property owners affected."

¶9    In December 2022, Wruck and the District stipulated to the dismissal of the District's claims without prejudice in exchange for Wruck delivering to the District a deed to transfer the "mill race lands." The stipulation left only Wruck's counterclaim seeking equitable reformation and apportionment of the cost of the dam failure analysis in the case.

¶10 Both parties filed summary judgment motions. In his motion, Wruck argued that the parties' mutual mistake regarding the validity of the 2002 dam failure analysis and Wruck's ability to "obtain a dam failure analysis solely over his dam parcel" warranted equitable reformation of the Agreement to "spread the cost of the dam failure analysis among the 330 lake property owners." In an affidavit supporting his motion, Wruck asserted that Jensen made the following statements at mediation:

> Mr. Jensen explained that the District had performed a dam failure analysis in approximately the year 2000 which the **DNR had approved** [in 2002]. Mr. Jensen advised that the District would not take on the liability of my part of the dam **without the DNR agreeing to extend its year 200[2] dam failure analysis**. Mr. Jensen offered to provide a copy of the District's dam failure analysis flood mapping to allow me to **apply to the DNR to extend the failure analysis over my dam parcel**.

(Emphases added.)

¶11 With its motion, the District filed an affidavit from Jensen, who stated that the District "never contemplated" that Wruck could obtain a new failure analysis "only in relation [to] that portion of the dam located on property owned by him." Jensen stated further that the District was aware that the 2002 dam failure analysis "would need to be updated" when it signed the Agreement and did not represent "that the data upon which the [analysis] was prepared was current." The District argued that the Agreement was unambiguous and that Wruck had not offered clear and convincing evidence of a mutual mistake that would justify reformation.

¶12 In response to the District's motion and Jensen's affidavit, Wruck raised a new argument: he contended that the District had defrauded him into entering into the Agreement by not disclosing during mediation that a new dam

failure analysis would be necessary and that Wruck would not be able to limit its scope to his portion of the Kroll Dam.

¶13    The circuit court held a hearing on the parties' motions on December 22, 2023.    Wruck's counsel identified two issues for the court's attention at the start of the hearing: (1) whether the Agreement "is … an agreement to agree or is it an agreement that can be enforced or modified"; and (2) "whether there is a mutual mistake or misrepresentation" that would support equitable reformation.    In response to questioning by the court, Wruck's counsel acknowledged that Wruck had not raised misrepresentation as a ground for reformation in his counterclaim.

¶14    After hearing argument from the parties, the circuit court granted the District's motion and denied Wruck's motion.    The court rejected Wruck's arguments that the parties had agreed that the 2002 dam failure analysis remained valid or that the District would defray some of the expense of obtaining an updated analysis:

> The [A]greement is clear.  It doesn't state that the dam failure analysis provided by the [D]istrict has to be recent, timely.  It just says they're going to provide what they have.  It doesn't say that they have to pay any portion of the dam failure analysis that the defen[dant] Mr. Wruck is obliged to perform under the [A]greement.  It doesn't say it's limited to just his portion.  That doesn't make any sense.  And for all the reasons outlined by the [District], they're entitled to summary judgment.
>
> There is no basis for a mutual mistake.  There is no basis for fraud.  Mr. Wruck made apparently a bad agreement that he doesn't want to live by but that's life in the big city as my dad would say.  He negotiated this [A]greement.  He was obliged to do what he promised to do.  And in my equitable discretion I'm not going to reform it because the language of the [A]greement is clear and he hasn't identified a sufficient basis which is a high standard to

reform the [A]greement to get him out of what he promised to do.

¶15     Following the court's ruling, Wruck's counsel asked whether the court had ruled "on the enforceability of the [A]greement." The court disagreed with Wruck's assertion that his motion had raised the enforceability of the Agreement as an issue, noting that Wruck had "already complied with [the] terms of the [A]greement by transferring a portion of the parcel." When Wruck's counsel told the court that Wruck's motion had asked the court to "either reform it or hold that the … [A]greement is unenforceable," the court stated that enforceability "certainly wasn't briefed. If that's what you're claiming, I'm not finding it unenforceable."

## STANDARD OF REVIEW

¶16     Our review of the circuit court's summary judgment decision is de novo. *Schabelski v. Nova Cas. Co.*, 2022 WI App 41, ¶25, 404 Wis. 2d 217, 978 N.W.2d 530. Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).

## DISCUSSION

### I. Indefiniteness

¶17     Wruck first contends that the circuit court erred in concluding that the Agreement was enforceable. He argues that the Agreement is unenforceable under *Paul R. Ponfil Trust v. Charmoli Holdings, LLC*, 2019 WI App 56, 389 Wis. 2d 88, 935 N.W.2d 308, because two of its provisions are indefinite. Specifically, Wruck points to paragraph three, in which the parties "agree to assess

liability of exposure attributable to the Wruck portion of the dam," and paragraph four, which states that "[i]f appropriate, [the] parties would agree to negotiate in good faith relative to a purchase or maintenance agreement of the Wruck land encumbered by the dam." Wruck contends that these provisions contain the same type of "agreement to agree" language that we deemed too indefinite to create an enforceable settlement in *Ponfil*.

¶18 The District disagrees with Wruck's reading of these paragraphs, but it also argues that Wruck forfeited his indefiniteness argument because he did not raise it in the summary judgment briefing below. *See McKee Fam. I, LLC v. City of Fitchburg*, 2017 WI 34, ¶32, 374 Wis. 2d 487, 893 N.W.2d 12 ("Generally, issues not raised or considered by the circuit court will not be considered for the first time on appeal."). Wruck responds that he cited *Ponfil* in his summary judgment brief and also asserted an affirmative defense in his answer that the Agreement was not enforceable "because of the District's indefinite and illusory promises." Wruck also notes that the circuit court concluded at the summary judgment hearing that the Agreement was enforceable.

¶19 We need not determine whether Wruck forfeited his indefiniteness argument because even if we concluded that the argument was preserved, it fails on its merits. In *Ponfil*, we examined a settlement agreement which included a provision in which the parties to a property dispute agreed "to sign a separate substantive agreement covering things such as liability & indemnity in usual form." *Ponfil*, 389 Wis. 2d 88, ¶3. The parties exchanged detailed drafts of the separate agreement but were ultimately unable to reach an agreement as to its terms. *Id.*, ¶¶4-5. On appeal, we concluded that the settlement agreement was not enforceable because the terms regarding "liability and indemnity … were never agreed to in writing, rendering this provision incapable of enforcement for lack of

definiteness." *Id.*, ¶27. To be enforceable, we explained, "the material terms of the settlement must be addressed with a reasonable degree of certainty and definiteness." *Id.*, ¶22. The settlement agreement in *Ponfil* did not meet that standard because the terms regarding liability and indemnity were material, but the parties had been unable to reach an agreement on them. *Id.*, ¶¶21-22.

¶20     Wruck argues that paragraphs three and four of the Agreement do not meet the standard of reasonable certainty and definiteness that we articulated in *Ponfil* because they specify "nothing definite or certain about what the District or Wruck would be required to do once liability exposure of Wruck's land to dam failure was assessed." We do not agree. Though the paragraphs leave the parties' ultimate course of action with respect Wruck's portion of the dam open-ended, that was by necessity, and it does not render those paragraphs indefinite, or the Agreement unenforceable.

¶21     At the time of the mediation the parties could not, in the words of paragraph three, "assess liability of exposure attributable to the Wruck portion of the dam" because they needed, but did not have, the dam failure analysis Wruck agreed to have performed in paragraph two. Paragraph three thus imposes a more limited, but nonetheless reasonably certain and definite, obligation on the parties: to make the liability assessment once they have the analysis in hand. Paragraph four, which immediately follows paragraph three, likewise imposes a reasonably certain and definite obligation once the parties receive and review the analysis: if they deem it appropriate, they are to "negotiate in good faith relative to a purchase or maintenance agreement of the Wruck land encumbered by the dam." That the parties limited their obligation in paragraph four to a good faith negotiation and did not commit themselves to any specific action or obligation beyond that does not render the Agreement unenforceable.

¶22    Wruck's analogy to *Ponfil* falls short because the facts in that case are materially distinguishable from those here.  Nothing in *Ponfil* suggests that the parties in that case needed information they did not possess in order to finalize the limitation of liability and indemnity provisions in their settlement agreement.  They were simply unable to agree on those provisions.  In contrast, Wruck and the District needed the dam failure analysis before they could "assess liability of exposure attributable to the Wruck portion of the dam" and determine whether it would be appropriate to "negotiate … a purchase or maintenance agreement" relative to "the Wruck land encumbered by the dam."  *Ponfil* therefore does not compel a conclusion that the Agreement is indefinite.

## II.  Equitable Reformation

¶23    Wruck's second argument is that the circuit court erred in failing to reform the Agreement to apportion the cost of the new dam failure analysis between the parties, or across the more than 300 property owners "benefited by the dam complex."  He contends that the court did not "apply the proper legal standard" and "that it is inequitable and unjust for Wruck, whose lake parcels are less than 5% of the dam complex," to bear all of the cost of the failure analysis.  He asks us to remand the case to the circuit court and direct it "to determine an equitable apportionment of the expenses between the parties related to the completion and approval" of the new failure analysis.

¶24    We decline to do so for several reasons.  First, Wruck does not support his reformation argument with any citation to legal authority.  *See* WIS. STAT. RULE 809.19(1)(e) (requiring arguments in briefs to include citations to applicable legal authorities).  His argument is also undeveloped, as he does not explain why the circuit court erred in concluding that he had not established either

11

of the two legal grounds for which reformation is a remedy—a mutual mistake of both parties or a mistake by one party and fraudulent conduct by the other. *See Russ ex rel. Schwartz v. Russ*, 2007 WI 83, ¶37, 302 Wis. 2d 264, 734 N.W.2d 874; *see also Mid-States Underwriters, Inc. v. Leonhard*, 48 Wis. 2d 176, 182, 179 N.W.2d 914 (1970). As the party seeking reversal of the circuit court's order, it was Wruck's burden to do so. *See Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381. For these reasons alone, we could reject his reformation argument without further comment. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (stating that we need not consider arguments that are unsupported by adequate factual and legal citations or are otherwise undeveloped). Nonetheless, we will further address it briefly to explain why the circuit court did not err in granting the District summary judgment.

¶25 With respect to mutual mistake, our review of the record reveals no reason to set aside the circuit court's conclusion that there was "no basis" for such a claim. A mutual mistake exists if the parties "agreed on facts that were different than those set forth [in] the [contract]" or were mistaken "as to the contents or effect of the writing." *Chandelle Enters., LLC v. XLNT Dairy Farm, Inc.*, 2005 WI App 110, ¶18, 282 Wis. 2d 806, 699 N.W.2d 241 (first quotation); *Ivancevic v. Reagan*, 2013 WI App 121, ¶15, 351 Wis. 2d 138, 839 N.W.2d 416 (second quotation; citation omitted). The mistake must be "reciprocal and common to both parties" to justify reformation. *Chandelle Enters.*, 282 Wis. 2d 806, ¶20.

¶26 Although Wruck averred in his summary judgment affidavit that he believed the 2002 dam failure analysis remained valid and that he would only have to obtain an analysis covering his parcel, Jensen's affidavit indicates that the District did not share those beliefs. To the contrary, Jensen averred that the District knew the 2002 failure analysis "would need to be updated" and denied

"represent[ing] that the data upon which [that analysis] was prepared was current." He also stated that the District "never contemplated … that Wruck could have the [dam failure analysis] required by the … Agreement performed only in relation [to] that portion of the dam located on property owned by him." Thus, the summary judgment record showed that any mistaken belief of Wruck concerning the 2002 failure analysis was not shared by the District. Because Wruck would be unable to establish a mutual mistake, the circuit court correctly granted the District's motion as to that ground for reformation.[2]

¶27 Once it became apparent in the summary judgment briefing that no mutual mistake had occurred, Wruck pivoted to unilateral mistake, arguing that Jensen misled him into believing that he could obtain a failure analysis covering only his portion of the Kroll Dam because the 2002 dam failure analysis remained valid. Again, other than pointing to his averments, Wruck utterly fails to develop any argument as to reformation based on a unilateral mistake accompanied by fraud. Nevertheless, we address this argument as well.

¶28 A unilateral mistake only furnishes a basis to reform an agreement where the mistake concerns a past or present fact that is material to the parties' agreement. *See Lundin v. Shimanski*, 124 Wis. 2d 175, 192, 368 N.W.2d 676 (1985) (misrepresentation "must relate to present or pre-existing facts" (citation omitted)); *Gielow v. Napiorkowski*, 2003 WI App 249, ¶24, 268 Wis. 2d 673, 673 N.W.2d 351 (analyzing unilateral mistake claim premised on home seller's

_____

[2] Wruck does not argue that the circuit court's ruling with respect to mutual mistake was erroneous in his briefs to this court.

awareness that family room was improperly built and violated building codes at time of sale).

¶29     Even if Wruck could establish that Jensen represented to him that he could obtain a failure analysis covering only his portion of the Kroll Dam because the 2002 dam failure analysis remained valid, Wruck's unilateral mistake claim would fail as a matter of law.  The reason is that Jensen's purported representation was not a statement of present or past fact.  It was instead "a prediction as to events to occur in the future," which "is to be regarded as a statement of opinion only, on which the adverse party has no right to rely."  *See **Lundin***, 124 Wis. 2d at 192 (citation omitted).  As Wruck acknowledged, his ability to "extend" the 2002 dam failure analysis to his parcel depended on the DNR's agreement.  Wruck averred in his summary judgment affidavit that Jensen told him (1) the DNR "had approved" the 2002 analysis; (2) the District would need DNR's agreement to extend the 2002 analysis before assuming liability for Wruck's portion of the dam; and (3) the District would provide the 2002 analysis to Wruck so that he could "apply to the DNR to extend the failure analysis over [his] dam parcel."

¶30     There are no facts to show that either party could be certain, at the time of mediation, what the DNR would require.  Whether the DNR would deem the 2002 analysis to be valid and allow Wruck to obtain an analysis limited to his parcel was not within either party's control.  Nothing in the Agreement suggests otherwise.  Thus, any belief by Wruck as to whether he could extend the 2002 analysis to his parcel was, at the time of the mediation, necessarily a matter of conjecture, and Wruck assumed responsibility for the possibility that he might not be able to do so.  *See **Continental Cas. Co. v. Wisconsin Patients Comp. Fund**,* 164 Wis. 2d 110, 118, 473 N.W.2d 584 (Ct. App. 1991); *see also **State v. Bougneit**,* 97 Wis. 2d 687, 694, 294 N.W.2d 675 (1980) ("[A]n act done with

14

knowledge that a fact cannot be determined with certainty until some future date is not done under a mistake of fact but is instead a mistake of judgment."). Indeed, it was not until August 2020, nine months after the mediation, that the DNR informed the parties that the data underlying the 2002 analysis was outdated and that a new analysis covering the entire dam would be needed.

¶31 In the end, Wruck's argument rests on the purported inequity and unfairness in requiring him to bear all of the cost for a new dam failure analysis, which may be more expensive and extensive than he thought it would be. Wruck may regret his bargain, but he has not established sufficient legal grounds to set aside or reform the Agreement.

## CONCLUSION

¶32 For the reasons stated above, we conclude that Wruck has not shown that the circuit court erred in granting the District's motion for summary judgment and denying his motion. The court's order is thus affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

No.    2024AP447(C)


¶33    GROGAN, J. (*concurring*).  Steven Wruck filed a lawsuit against the Eagle Spring Lake Management District because he believed the District should be responsible for the costs associated with maintaining the small part of the dam[1] that was located on his property.  That lawsuit was settled via mediation, and the settlement agreement arising from that mediation is the subject of this appeal.  Here, Wruck asserts that he understood the agreement as requiring him to pay for a dam failure analysis solely on *his* property.  He later discovered, however, that the DNR required an updated analysis of the *entire* dam—that is, both his small portion *and* the entire portion on the District's property—and the District has taken the position that pursuant to the settlement agreement, Wruck is solely responsible for financing the updated analysis of the *entire* dam.  The obvious question is why would Wruck settle a lawsuit he brought—that he initiated to make the District pay for *his* portion of the dam—by agreeing to pay for the *entire* dam failure analysis?  Clearly, something is amiss.

¶34    In reviewing the settlement agreement as a whole, I am not convinced that it is clear and unambiguous.  For example, why would the settlement agreement require that the DNR stake *only* Wruck's property "to allow for the dam failure analysis to be performed" if Wruck was obligated to obtain, and pay for, a full-dam analysis?  Why would Wruck need to obtain the District's prior full-dam analysis if he was required to start fresh and redo the entire thing?

---

[1]  Wruck asserts that his portion of the dam constituted only five percent of the total dam. This fact is undisputed.

These two questions alone cast doubt on what it is the parties actually agreed to in the settlement agreement.

¶35    However, any argument that the terms of the settlement agreement were ambiguous on this point—and that summary judgment in the District's favor was therefore inappropriate at this juncture—was not raised below and is not sufficiently developed on appeal.  As we have repeatedly stated, this court does not develop arguments for the parties on appeal.  *See Schonscheck v. Paccar, Inc.*, 2003 WI App 79, ¶11, 261 Wis. 2d 769, 661 N.W.2d 476 (explaining that it is "[a] fundamental appellate precept … that we 'will not … blindside trial courts with reversals based on theories which did not originate in their forum'" (second omission in original)); *State v. Gee*, 2019 WI App 31, ¶40, 388 Wis. 2d 68, 931 N.W.2d 287 (explaining that the appellate court does not act as an advocate or abandon its neutrality to develop arguments for litigants).  Likewise, appellate courts need not address undeveloped arguments.  *See, e.g.*, *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).  Accordingly, although I do not join the Majority's analysis, I join the mandate and respectfully concur.