FEHRMAN, Appellant, vs. BISSELL LUMBER COMPANY, Respondent.

*May 12—November 17, 1925.*

*Boundaries: Lost corners: Evidence: Testimony of witnesses as to bearing trees: Weight: Act of landowners preserving obliterated corner: Laying out highway: Wrongful cutting of timber: Statutory measure of damages: Constitutionality of statute.*

1. The jury in a case concerning a boundary-line dispute cannot disregard or disbelieve the unimpeached testimony of witnesses as to the location of a quarter post.   p. 86.

2. The opinion of a surveyor, experienced in both estimating and measuring distances, as to the distance from a quarter corner to a river, cannot be utterly ignored though he did not measure the distance.   p. 87.

3. The act of the town chairman, who was also a stockholder in charge of logging operations of a lumber company on land owned by it in a certain section the boundary of which was disputed, in laying out highways intersecting at a point which he testified was a quarter corner, cannot be accorded great weight as an act of landowners preserving an obliterated corner, within the meaning of a circular of the General Land Office issued in 1903.   p. 88.

4. Monuments, such as witness trees and stakes established by the original survey, or any natural object, such as a river, mentioned therein, will control courses, distances, and quantity.   p. 88.

5. Testimony of witnesses as to the location of bearing trees at a quarter corner is not conclusive on the jury as to the location of an original quarter post, in view of its inconsistency with every distance mentioned in the field-notes; and such testimony may be impeached, as well as corroborated, by extraneous facts and circumstances.   p. 89.

6. In an action for damages for trespass and the conversion of timber, involving a dispute as to the boundary of land to which plaintiff had the conceded title, defendant, who failed to serve on plaintiff an affidavit that the cutting of the timber on the disputed strip was done by mistake, with a written offer to confess judgment for a specified sum under sec. 4269, Stats., cannot set up such defense, and plaintiff may recover the log value of the timber cut.   p. 91.

*On rehearing.*

7. A dispute over a boundary line does not constitute a dispute concerning the title to the premises involved.   p. 92.

8. Sec. 4269, Stats., does not impose a penalty upon litigants who assert title to lands, but merely prescribes the measure of damages for the wrongful cutting of timber upon the lands of another; and the power of the legislature to prescribe such measure of damages is unquestioned.   p. 95.

9. The exemption in the case of a trespasser whose act was the result of inadvertence or excusable negligence constitutes a valid classification, and said sec. 4269, Stats., does not offend against the Fourteenth amendment to the federal constitution or any other constitutional provision.   p. 96.

ROSENBERRY, J., dissents.

APPEAL from a judgment of the circuit court for Lincoln county: A. H. REID, Circuit Judge. *Reversed, with instructions.*

For the appellant there was a brief by *Smith & Wurster,* attorneys, and *F. J. Smith,* of counsel, all of Merrill, and oral argument by *C. B. Wurster* and *F. J. Smith.*

For the respondent there was a brief by *Goggins, Brazeau & Graves* of Wisconsin Rapids, and oral argument by *Theo. W. Brazeau.*

The following opinions were filed June 22, 1925:

OWEN, J.   This action was brought to recover damages for trespass and conversion of timber alleged to have been unlawfully cut from the north half of the northeast quarter of section 10, township 35 north, of range 4 east, in Lincoln county, Wisconsin, and more particularly that part thereof included within the triangle marked Y N B on the diagram on page 84.

The question presented is whether the line X Y K B or the line X N A B constitutes the section line between sections 3 and 10, the appellant claiming the first, and the respondent the latter, to be such line.

The case was tried before a jury, which found the line X Y K B to be the true line. The court set aside the verdict of the jury, holding that under the evidence the line X N A B is the true line. The appeal raises the question whether there was any evidence to sustain the verdict of

the jury.    The real question is whether the quarter post between sections 3 and 10 is a lost or obliterated corner, as, if it is a lost corner, there is no dispute but that a relocation

thereof in accordance with established rules. fixes it at Y. It is claimed by respondent that it is not a lost corner, and its contention is based upon evidence which may be epitomized as follows: The witness H. H. Stolle, who was

chairman of the town in which the disputed premises are located for a period of fifteen years, from about 1905 to 1920, testified that in 1902 he was one of the stockholders and looked after the logging operations of the Stolle Lumber & Veneer Company. That company owned the northern four forties of section 10 and prosecuted logging operations upon said forties in 1902; that before starting to log said forties the witness, together with his foreman, located the section line between sections 10 and 3. He testified that he located the witness trees bearing upon the quarter corner. They corresponded with the witness trees mentioned in the field-notes. They had the government marks on them, "¼ section." He did not claim that he found the government stake, but testified that there was some old rotted-down stake there. The quarter corner as thus located is at the point A on the diagram. The dotted lines on the diagram running east and west and north and south represent existing roads and highways which cross at A, the place where Stolle claims the quarter corner to be, but those roads were not there at the time Stolle located the quarter corners. Stolle also testified that he found blazes on the trees located east and west along the line X N A B. He did not, however, place any stake at the point which he located as the quarter corner. The Stolle Lumber & Veneer Company cut no timber north of the line so fixed by Stolle as the section line between sections 3 and 10.

Another witness, J. F. Kavanaugh, testified that he saw one witness tree at the quarter corner between sections 3 and 10 in 1902. "There was a spot on it, and bearing marks on it, but they were a little dim. And I clawed down below the root and I found two letters there, quite plain. The letters 'B T.'" It was very close to where the roads now cross, but there were no roads there at that time. He did not find anything resembling a government corner stake.

Another witness, Abe Yohn, testified that he was running a camp for the Stolle-Brandt Lumber Company in 1902

and 1903, when they were cutting on the north half of the northeast quarter of section 10. He testified that he saw a hemlock tree upon which there were government marks reading "½ section." He testifies also that there was a new quarter post stuck in there. This was at the point marked A on the diagram.

This testimony, standing alone, was sufficient to locate the quarter post at the point A, and if the jury was bound to believe it they were unwarranted in finding that the true quarter corner was at point Y. They could not disregard it or disbelieve it unless the record contained evidence impeaching it. The trial court came to the conclusion that "there is nothing in the evidence that seriously impeaches the testimony of these witnesses," and accordingly set aside the verdict of the jury in this respect. It is necessary, therefore, to consider whether the evidence relied upon by the plaintiff is sufficient to cast doubt on the testimony of these witnesses or to justify a contrary inference.

It is conceded that the northeast and northwest corners of section 10 are known corners. The government field-notes indicate that in surveying between sections 3 and 10 the surveyors started at the northeast quarter of section 10, proceeded west 39 chains and 87 links, and set the quarter-section post; that at 45 chains and 30 links they struck the Somo river, and that at 79 chains and 75 links they set the northwest corner of section 10. The line X Y K B corresponds with the distances called for by the field-notes, while it is apparent that the line X N A B calls for a considerably longer distance. The government field-notes show the distance from the northeast corner of section 10 to the quarter corner to be 39 chains and 87 links, and from that corner to the Somo river a distance of 45 chains and 50 links. It necessarily follows that the distance from the quarter corner to the Somo river is 5 chains and 63 links, or practically 22 rods. The distance from Y to the Somo river was not measured by any surveyor, but surveyor Smith

testified that it was about 22 rods. Although he did not measure the distance, his opinion as to the distance cannot be utterly ignored, as it is the opinion of one who has had experience in both estimating and measuring distances. It is undisputed that the point A, where appellant claims the quarter post to be, is about 12 rods south and about 12 rods east of point Y. The distance from point A to the Somo river was measured and found to be 33 rods. Blazed trees were found along the line X Y K B by the two surveyors who testified in the case. Stolle did not deny that there were blazed trees along that line. He said there might have been, but they were not sufficiently numerous to interest him.

Louis Kleinschmidt testified that when he was county surveyor of Lincoln county, beginning at the north line of section 3 he ran south along the quarter line of section 3. When he had chained a mile he was about ten rods north of point A. He found an old stake at the cross-roads, but he did not see any of the original government trees. He found a stake upon one side which was marked "¼," and on the other side it was pretty rotten. He would not say it was an original stake. He said it was an old stake. This was long after Stolle had located the corner. He stopped chaining when he was ten rods north of this post. After looking around and finding this post he chained eight or ten rods further to the post. Taking this as the quarter post, he found section 3 big from north to south.

It is undisputed in the evidence that a survey along the north-and-south quarter line through sections 3 and 10 intersected the section line between sections 3 and 10 very nearly at point Y.

A circular of the General Land Office relating to the restoration of lost and obliterated corners, issued in 1903, states:

"An obliterated corner is one where no visible evidence remains of the work of the original surveyor in establishing

it. ·Its location may, however, have been preserved beyond all question by acts of landowners, and by the memory of those who knew and recollect the true *situs* of the original monument.   In such. cases it is not a lost corner."

The evidence in this case discloses no acts of landowners which can be construed as preserving the quarter corner in question.   The only human activity disclosed by the evidence which can be said to have had any relation to that corner was the laying out and opening up of the highways which intersect at point A on the diagram.   At the time these highways were laid out Mr. Stolle was chairman of the town, and he, with two other witnesses, are the only ones who testified in this case who claimed to have had any general knowledge concerning this corner.   None of them claimed to have found the stake.   They do claim, however, to have found a bearing tree.   The act of Mr. Stolle in laying out the highway cannot be accorded great weight as the act of landowners which may be construed as a preservation of the corner.   As we view it, the question comes down to this: Is the evidence of three witnesses, who claim they found the bearing trees, conclusive as to the original location of this quarter corner?   If that be true, then it is within the power of corrupt witnesses, who are willing to testify directly and clearly to the necessary facts, to establish a government corner wherever they will.   Such cannot be the law.   We do not impute either dishonesty or corruption to the testimony of these witnesses.   But their testimony must be weighed by the rules which are generally applied in the consideration of evidence.

There is much evidence in this case which justifies the inference that the quarter corner in question was not located at point A.   In the first place, it does not correspond in any single particular with the original field-notes.   We have in mind the rule that monuments such as witness trees and stakes established by the original survey, or any natural

object, such as a river, mentioned in the survey, will con-
trol courses, distances, and quantity. *Lind v. Hustad,* 147
Wis. 56, 132 N. W. 753. But these are rules to be applied
after the existence of such monuments are definitely deter-
mined. We are now analyzing the evidence for the purpose
of determining whether the testimony relating to the ex-
istence of the witness trees at this quarter corner is con-
clusive that the original quarter post was located at point
A. So we say, in the first place, that the existence of such
witness trees at the point testified to is inconsistent with
every distance mentioned in the field-notes. Point A is ten
rods too close to the southeast corner of section 3, and ten
rods too far distant from the southwest corner of section 3.
It is some eleven rods too far distant from the Somo river,
according to the field-notes. The Somo river is a natural
monument and its relation to the point where the quarter
post was established is of great weight. This is a natural
monument the existence of which does not depend upon the
memory or the testimony of witnesses. The location of a
corner at point A is inconsistent with its distance from the
Somo river as declared by the field-notes. It is inconsistent
with the idea that the section line between section 10 and
section 3 is a straight line. It is inconsistent with a straight
north-and-south quarter line through sections 3 and 10, both
of which are called for by the field-notes.

In view of all these circumstances we do not think that
the jury was obliged to treat the bare testimony of these
witnesses concerning the location of this quarter corner as
conclusive. Just as the testimony of witnesses may be cor-
roborated, so may such testimony be impeached, by extra-
neous facts and circumstances. We think the verdict of the
jury was not only justified by the evidence in this case, but
that it was in accordance with the reasonable inferences to
be drawn therefrom. We therefore hold that the trial court
erred in changing the answer of the jury to the first ques-

tion.   It results from this conclusion that the plaintiff is entitled to recover for the value of the timber removed from the disputed premises, and this raises the question of plaintiff's measure of damages.

Sec. 4269, Stats., provides that—

"In all actions to recover the possession or value of logs, timber or lumber wrongfully cut upon the land of the plaintiff or to recover damages for such trespass the highest market value of such logs, timber or lumber, in whatsoever place, shape or condition, manufactured or unmanufactured, the same shall have been, at any time before the trial, while in the possession of the trespasser or any purchaser from him with notice, shall be found or awarded to the plaintiff, if he succeed, except as in this section provided."

The section then provides for two exceptions.   The first is that "The defendant in any such action may, at or before the time of the service of his answer, serve on the plaintiff his affidavit that such cutting was done by mistake and therewith an offer, in writing, to allow judgment to be taken against him for the sum therein specified, with costs." It is then provided that the plaintiff may accept the offer, and, if not accepted, the affidavit shall be deemed traversed, and the question of mistake shall be submitted to the jury. In this case the defendant made no such affidavit or offer and took no steps whatever to bring itself within this exception to the general provision of the statute.   Defendant does claim, however, that it has brought itself within the next exception of the statute, which reads: "provided, that in all actions hereafter commenced when the defendant shall have in good faith acquired a title to and entered upon the land under the same, believing such title to be valid, and shall have cut the timber therefrom under such circumstances, then the plaintiff, if he shall recover, shall recover only the actual damages sustained by reason of such cutting."

Defendant's contention cannot be sustained.   No question is raised concerning the validity of plaintiff's title to

the land which it actually purchased.   The dispute in this case is as to the location of the boundary lines of the lands to which it has conceded title.   It is nothing more nor less than a boundary-line dispute.   If the controversy in this case can be said to be a dispute concerning title to land which the defendant claims to own, then there can be no such thing as a boundary-line dispute, and all controversies of this nature involve title to land.   Defendant cut this timber evidently believing it to be on land to which it had an undisputed title.   It was simply mistaken as to the boundaries of the land which it actually owned.   The cutting, therefore, was by mistake, but the defendant did not proceed in the manner prescribed by sec. 4269 to tender that issue. The fact that the cutting was done by mistake, therefore, is not available to the defendant as a defense in this action. The court improperly submitted to the jury the question whether such cutting was done by mistake, as no such issue was raised or tendered.   It follows that the plaintiff is entitled to recover as damages the log value of the timber cut.

*By the Court.*—Judgment reversed, and cause remanded with instructions to render judgment in favor of the plaintiff for the log value of the timber cut upon the disputed premises.

ROSENBERRY, J. (*dissenting*).   If the corner in controversy were in fact lost, I should agree that the result reached by the court is correct.   The trial court in its opinion said:

"There is nothing in the evidence that seriously impeaches the testimony of the witnesses Stolle, Yohn, and Kavanaugh, all of whom say they saw government witness trees bearing government marks at the quarter corner where is now the intersection between the north-and-south and east-and-west roads, and that the roads were built and timber cut in accordance with the line established by that location of the quarter post.   In this state of evidence it is not permitted to say that the quarter corner was a 'lost' corner.   Only by finding that the quarter-section corner was lost and not merely obliterated could the jury properly find that the

Smith line was the true line.   In order to do this, the jury were obliged to disregard the evidence of the witnesses Stolle, Yohn, and Kavanaugh, or to disregard the instructions of the court on the subject."

In reaching this conclusion the trial court was in my opinion fully justified.   If an obliterated corner can ever be established by evidence it seems to me that· the corner in question was established in this case.   Therefore I think no jury issue was presented upon that phase of the case by the evidence.

In any event, the defendant has not had the benefit of the exercise of the discretion of the trial court as to whether or not there should be a new trial, and, even if the case is to be reversed, the mandate should allow the trial court to pass upon that question.

The following opinion was filed November 17, 1925:

OWEN, J. (*on rehearing*).   Upon motion for rehearing counsel for respondent vigorously insist that the court fell into grievous error with reference to the measure of damages applicable to this case.   It is argued that the title to the strip upon which the timber was cut was involved in the trial of the action, and that under the last proviso of the section set forth in the main opinion the plaintiff could recover only the actual damages sustained by reason of the cutting.   A reconsideration of the question leaves no doubt in our minds that the question of title to the premises was not involved in the action.   The great weight of authority holds that a dispute over a boundary line does not constitute a dispute concerning the title to the premises involved in such dispute.   Because the settlement of such a dispute does not involve a grant or conveyance of land, but merely the identification of land already conveyed, it is held that such disputes may be settled by parol agreements, or that they

may be submitted to arbitration by parol agreements.  Thus, in 4 Ruling Case Law, 126, it is said:

"An oral agreement between adjoining owners establishing a boundary line theretofore uncertain between their lands is not prohibited by the statute of frauds, nor is it within the meaning of statutes regulating the manner of conveying real estate; nor is such an agreement obnoxious to the rule forbidding the introduction of parol evidence to contradict a written instrument.  Agreements of this character do not operate as a conveyance so as to pass the title from one to the other, but proceed upon the theory that the true line of separation is in dispute, and to some extent unknown, and the agreement serves to locate the line to which the title of each extends."

In 2 Ruling Case Law at p. 359 it is said:

"A distinction should be made, however, between controversies as to title to land and controversies merely involving the location of boundary lines.  The latter do not come within the statute of frauds, and therefore may be submitted to arbitration by an oral agreement, provided the location of the boundary is indefinite or uncertain."

In 9 Corp. Jur. 232 it is said:

"The validity and legal force of parol agreements to settle disputed boundary lines was long resisted on the ground that, in effect, they passed the title to real property without the solemnities required by the statute.  However, it is now settled beyond dispute that an oral agreement between adjoining owners, establishing a dividing line between their land, is not prohibited by the statute of frauds, nor is it within the meaning of the provisions of the law that regulate the manner of conveying real estate.  The reason for this rule evidently is based on the idea that the parties do not undertake to acquire and to pass the title to real estate, as must be done by written contract or conveyance; but they simply by agreement fix and determine the situation and location of the thing that they already own, the purpose being simply by something agreed on to identify their several holdings and to make certain that which they regarded as uncertain."  See, also, 5 Corp. Jur. 30.

A perusal of the cases cited to support these texts leaves no doubt of their correctness, and it seems clear that the issues in this case did not involve any question of title to land. There was simply involved the question of the identity of land to which the respective parties had undisputed title. The muniments of title held by the respective parties conveyed the title to the premises therein described, and the controversy here involved was simply one of fact concerning the identification of the premises with which said muniments of title invested the respective parties.

It is claimed that sec. 4269, Stats., as construed, contravenes the Fourteenth amendment of the constitution of the United States and denies to the respondent due process of law and the equal protection of the law, and that it is contrary to the provisions of the state constitution. In support of this contention reference is made to *Smith v. Sherry,* 54 Wis. 114, 11 N. W. 465, the decision in which probably suggested the title proviso of sec. 4269. That was an action brought by a tax-title claimant against the original owner for damages for the removal of timber. The controversy in that case involved the title to the land. It was held that the tax deed was invalid, and the plaintiff did not recover. The invalidity of sec. 4269 was urged in that case if it penalized the defendant for defending his title to the premises, the court saying:

"Counsel for the appellant do not claim that sec. 4269 applies to a case in which there is an honest controversy about the title, and concede that if it did it would be void, for the reason that it would practically debar the defendant from litigating his title by imposing a penalty if his defense failed."

The court, however, did not pass upon that question. If the concession there made be true with reference to the defense of title, why is it not true with reference to any other defense? The courts are open and free to all litigants, and no litigant should be penalized for submitting his contro-

versy to the courts. *Will of Keenan, post,* p. 163, 205
N. W. 1001 (decided herewith).   It would seem that this
is just as true where a litigant claims his boundaries to in-
clude the disputed premises as where he claims his title to
be superior to that of the adverse party.   If sec. 4269 did
impose a penalty upon a litigant who asserts title to the
premises, then it is just as true that in its present form it
imposes a penalty upon a 'litigant who in good faith claims
his boundaries include the disputed premises.   But we do
not think sec. 4269 imposes a penalty at all.   It merely
prescribes the measure of damages for the wrongful cutting
of timber upon the lands of another, the power of the legis-
lature to prescribe which has never been questioned.   It
permits the plaintiff to recover "the highest market value of
such logs, timber or lumber, in whatsoever place, shape or
condition, manufactured or unmanufactured, the same shall
have been, at any time before the trial."   According to some
authorities, this was the rule of the common law, although
probably the weight of authority held the proper measure
of damages to be the value of the property at the time of
the conversion.   This was indicated in the opinion in *Wey-
mouth v. C. & N. W. R. Co.* 17 Wis. 550, where this court
was first called upon to consider the proper rule of damages
under such circumstances.   The rule prescribed by sec. 4269
obtains by judicial decision in many states.   4 Sutherland,
Damages (4th ed.) § 1111.   We conclude, then, that it was
well within the power of the legislature to prescribe that the
measure of damages in actions to recover damages for the
wrongful cutting of timber should be the highest market
value of the timber in any state to which it might have
been converted at any time before the trial, and end there.
That would leave a definite, certain, and not an unprece-
dented measure of damages to be followed in all cases.

However, the legislature saw fit to make an exception in
cases where the timber was cut by mistake, but in order to
make such exception available to the defendant it required

the service upon the plaintiff of an affidavit by the defendant to the effect that the cutting was done by mistake.   The service of this affidavit must be at or before the service of the answer. It would seem that no objection can be made to the validity of this exception, unless it be an improper classification.   But the classification seems eminently proper. It makes a distinction between a wilful trespasser and one whose trespass was the result of inadvertence or excusable negligence.   It exempts the trespasser by mistake from the measure of damages prescribed by the statute, and it cannot be said that the trespasser who does not or will not or cannot make the affidavit is penalized because of the measure of damages to which the statute subjects him.   Any trespasser sued for damages for the unlawful cutting of timber is privileged to make affidavit.   If he claims title to the premises from which the timber was cut he has the election of standing upon his legal right, in which case he will pay nothing if he be successful in his litigation, or making the affidavit.   If he does not make the affidavit and stands upon his legal right, and it is determined that he had no lawful right to cut the timber, then the measure of damages prescribed by the statute applies to him.   We do not construe this statute as imposing a penalty upon any one.   It prescribes a general measure of damages.   It exempts those who can prove that the cutting was by mistake.   This exemption constitutes a valid classification.   We do not think the statute offends against the Fourteenth amendment to the constitution of the United States, or any other constitutional provision.

The motion for rehearing is denied, with $25 costs.