Theodore A. IVALIS, Plaintiff-Appellant-Cross-Respondent,

v.

William W. CURTIS, Elizabeth B. Curtis, Herbert Eggers, Sr., and Geraldine T. Eggers, Defendants-Third-Party Plaintiffs-Respondents-Cross-Respondents,

v.

Joseph L. HARDING, Third-Party Defendant-Respondent-Cross-Appellant.

Court of Appeals

*No. 92–0212. Oral argument December 7, 1992.—Decided January 12, 1993.*

(Also reported in — N.W.2d —.)

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of and orally argued by *Michael J. Dwyer* of *Machulak, Hutchinson, Robertson, Dwyer & O'Dess, S.C.* of Milwaukee.

On behalf of the defendants-third-party plaintiffs-respondents-cross-respondents, the cause was submitted on the brief of and orally argued by *Neal A. Nielsen III* of *Nielsen & Nielsen* of Eagle River.

On behalf of defendants-third-party plaintiffs-respondents-cross-respondents, the cause was submitted on the briefs of an orally argued by *Ralph W. Koopman* of Eagle River.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J.  Theodore Ivalis appeals a judgment dismissing his action to recover possession of certain real estate, and granting William and Elizabeth Curtis and Herbert and Geraldine Eggers' (the defendants) counterclaim for all right, title and interest to the disputed land based upon ten years of adverse possession under color of title. The court also awarded the defendants reasonable attorney fees and expenses from Joseph Harding, a surveyor, for his negligent survey made in connection with the sale of the disputed land to the defendants in 1971. The court denied Ivalis' request for his costs and attorney fees for Harding's negligence because he failed to properly plead and prove his claim. Harding cross-appeals the negligence award to the defendants.

This court affirms the judgment in all respects except as to a triangular piece of land claimed by the Curtises that was not included in the government survey upon which they rely to establish color of title. The judgment is therefore affirmed in part, reversed in part

and remanded for modification consistent with this decision. [1]

The judgment on the defendants' counterclaim was rendered pursuant to sec. 893.26 , Stats., the statute that bars actions for recovery of possession of real estate where the occupant proves uninterrupted adverse possession of ten years "under a good faith claim of title." [2] Ivalis does not challenge the good faith element of the defendants' claim. He does, however, challenge the defendants' assertion to claim or color of title. [3]

---

[1] The trial court retained its authority to exercise its equitable powers to effect remedies pursuant to sec. 843.09 and 843.10, Stats., in the event that the judgment on the 10-year adverse possession claim would be reversed on appeal. The trial court did not attempt to apply these statutory remedies but merely retained the power to apply them in the event the 10-year adverse possession judgment is reversed on appeal. We therefore need not decide the application of these statutes to Curtis at this time.

[2] The defendants concede that they do not qualify for adverse possession under the 20-year statute, sec. 893.25 and rely upon the 10-year statute, sec. 893.26:

**Adverse possession, founded on recorded written instrument.** (1) An action for the recovery or the possession of real estate and a defense or counterclaim based upon title to real estate are barred by uninterrupted adverse possession of 10 years, except as provided by s. 893.14 and 893.29. . . .

(2) Real estate is held adversely under this section . . . only if:

(a) The person possessing the real estate or his or her predecessor in interest, originally entered into possession of the real estate under a good faith claim of title, exclusive of any other right, founded upon a written instrument as a conveyance of the real estate or upon a judgment of a competent court; . . ..

[3] The parties agreed at oral argument that the phrases "color of title" and "claim of title" may be used interchangeably. We therefore assume for purposes of this decision only that the terms are synonymous.

Ivalis points to Wisconsin case law for the proposition that a person occupies land under color of title only where he physically occupies the land described in his deed. *See, e.g., Zuleger v. Zeh*, 160 Wis. 600, 605, 150 N.W. 406, 408 (1915); *Zurbuchen v. Teachout*, 136 Wis. 2d 465, 474, 402 N.W.2d 364, 369 (Ct. App. 1987). Ivalis then concludes that because the defendants' deeds locate their lands in Government Lot 8 and the survey of Gerald B. Inman, accepted by all the parties and the court as accurate, establishes that the defendants' lands actually lie in Government Lot 9, they do not occupy the land described in their deeds.

The defendants, on the other hand, concede that Inman's survey is accurate, but note that the establishment of a true survey line does not establish the title to the land in all cases. *See Grell v. Ganser*, 255 Wis. 381, 384, 39 N.W.2d 397, 398 (1949): "A survey establishing a line between adjacent owners will not revive the right of an original owner against an established boundary since all that the survey does is to establish the line and not the title." Thus, despite Inman's survey, the defendants base their claim of title upon the description in their deed attributable to boundaries established by an official survey made by the Vilas county surveyor in 1915 and recorded with the county register of deeds pursuant to statute.[4] We conclude that a deed drawn in reliance

---

[4] Sections 827*a*, 828, 829, 829*o* and 829*p*, ch. 39, Stats. (1915), provided:

**Relocation and perpetuation of section corners.** SECTION 827*a*. 1. Whenever a majority of all the resident land owners in any section of land within the state of Wisconsin shall desire to establish, relocate or perpetuate any sectional or other corner thereof, or in the same section a division line thereof, they may make a formal application in writing to the county surveyor of the county in which the land is situated who shall file such application in his office and such county surveyor shall also within a reasonable time give at least ten

upon the recorded survey of a government official acting pursuant to statute invokes the ten-year adverse possession statute, sec. 893.26, Stats.

The trial court found as a fact that the external boundaries of section 35 were established between 1859 and 1863 by government surveyors who set only the section corners and quarter-corners. The parties do not dispute that these corners are fixed and presumed accurate for all purposes.

The first subdivision of the interior of Section 35, including Government Lots 8 and 9, was accomplished by the Vilas county surveyor, Daniel Graham, in 1915, and recorded in 1918, and a copy of the record of survey

days' notice in writing to the owner or owners of all adjoining lands . . . of a notice stating the day and hour when such survey will be commenced and made, and said county surveyor or his deputy duly appointed shall, on the date so fixed, proceed to make the required survey and location. If a corner is to be perpetuated, he shall deposit in the proper place a stone or other equally durable material . . . and shall also enter in his field notes one or more bearing trees if there be such, the species and size, direction and distance thereof, and if there be no trees he shall deposit one or more suitable stones at a sufficient depth as witness to said corner . . ..

. . ..

**Landmarks evidence.** SECTION 828. All landmarks set under authority of the provisions of the preceding sections shall be presumptively deemed to be at the section and quarter-section corners, as originally established by the United States survey, at which they respectively purport to be set.

. . ..

**Recording of survey.** SECTION 829o. Any survey heretofore made under the preceding sections with a certificate of the surveyor attached thereto may be recorded in the office of the register of deeds of the county where such land is located.

**Record is prima facie evidence.** SECTION 829p. The said record or a certified copy thereof shall be prima facie evidence of the facts therein set forth.

The present statutes are similar. *See* sec. 59.62 through 59.64, Stats.

was included in each of the defendant's abstracts at the time of their respective purchases in the 1970's. Graham's survey erroneously located the north-south quarter-line (serving as the boundary between Lots 8 and 9), thereby placing the lands conveyed and occupied by the defendants in Lot 8 rather than Lot 9. [5] However, the evidence shows that he accomplished his task of surveying this fractional section intersected by the meandering waters of the Wisconsin River using equipment and methods acceptable in the profession at that time. The evidence also disclosed that surveyors in later decades used Graham's monuments to further subdivide the surrounding area.

Graham's error in establishing the line between Lots 8 and 9 was perpetuated by Harding in 1971, when he conducted surveys for Harry Pride, the common grantor to the defendants. Harding prepared the surveys knowing and intending that they would be relied upon by the defendants in their purchases from Pride. Har-

---

[5] Section 35 is known in surveying parlance as a "fractional section," that is, one that contains meandering water, including the Wisconsin River, so that surveyors divided it into fractional or government lots. Expert testimony at trial described how Graham completed his survey, and indicated that he was physically limited by the tools of his era to dragging a surveyor's chain so that he could not run a line directly across the Wisconsin River. He therefore ran the interior lines of the section to the river both north and south and stopped. Because section 35 is not a square section and there was a significant westerly jog on the east section line between the southeast section corner and the meander corner at the Wisconsin River, Graham adopted mean bearings for his courses south of the river in order to average out the width of the corresponding government lots. According to the expert testimony, this method was accepted and common practice by county surveyors in the early 1900's. Graham subdivided the interior of at least 24 sections in Vilas County.

ding accepted Graham's concrete monument marking the north boundary point between Lots 8 and 9. In a separate error, Harding failed to faithfully follow the Graham survey in all respects, thereby creating a discrepancy regarding a triangular piece of land that will be discussed more fully hereafter.

Ivalis purchased all of Lot 9, bordered by the Wisconsin River on the north and a town road on the south, in 1964. The defendants acquired their lands, also with the river and the road as north and south borders respectively, by deed in 1972. The Curtis deed purported to grant them the west 300 feet of Lot 8, while the Eggers' deed purportedly grants them the 500 feet in Lot 8, immediately east of the Curtis property.

Inman conducted his survey in 1989 and established what the court found to be the "true" north-south quarter-line. Inman concluded that the north-south quarter-line and the true survey line between Lots 8 and 9 are one and the same. Inman's survey thus establishes that the disputed property lies not in Government Lot 8 but in Lot 9.

As to Harding's negligence, Inman testified that Harding failed to use the level of care and skill required of a reasonable registered land surveyor in 1971, and thus negligently prepared the surveys of the land sold to the defendants. Harding presented evidence of his own contradicting Inman's opinion. The trial court accepted Inman's opinion and held Harding negligent.

■

In opposing the adverse possession claims, Ivalis relies upon the universal legal proposition that "color of title" is not acquired if the calls of the possessor's deed do not fall with the land located by a true survey. The cases so holding, however, do not involve a deed drawn in reliance upon a previously established official govern-

ment boundary made and recorded according to statute and using survey methods accepted at the time, and generally relied upon by the public thereafter. We conclude that for purposes of determining "claim of title," there is no reason in law or equity to discount and ignore the county surveyor's official determinations made a matter of public record and that apparently stood unchallenged for the better part of a century. Curtis argues with a touch of factual embellishment:

> The line determined by Inman represents a sort of technical arrogance: shot in a matter of hours by sophisticated EDM laser transits accurate to a fraction of a second of arc, it is undoubtedly accurate but stands in stark contrast to the arduous work performed by the original government surveyors, and the early county surveyors after them who hacked their way through a section confined to a line by compass and dragging a survey chain behind them.

It is reasonable to conclude that one purpose of the statute authorizing interior government surveys was to provide a public record upon which to base future conveyances. The defendants therefore meet the requirements of the ten-year claim of title statute.

The cases Ivalis cites are readily distinguished. *Zuleger*, for example, rejected a ten-year claim of title based where the possessor's deed conflicted with a prior recorded official plat. The possessor relied solely upon a private survey that was on its face in conflict with the recorded plat. The court noted: "A few elementary principles of law will dispose of the case. No monuments contradicting the measurements given on the plat and no substantial reason being shown to establish their inaccuracy, the plat must control." *Id.* at 604, 150 N.W. at 408. In the present circumstances Graham's survey should be accorded the stature of a plat, rather than that of a mere

759

private survey, and it demonstrated that the disputed lands were in Lot 8 as the deeds so described it.

In *Buza v. Wojtalewicz*, 48 Wis. 2d 557, 180 N.W.2d 556 (1970), a disputed twenty-foot strip of land was not within the call of the possessor's deed where the measurements in that deed purported to commence at the south line of a particular forty. The possessors, however, occupied the land in the field by reckoning the south boundary from a fence line built by the grantor that was in conflict with the true south boundary later established by survey. Thus, unlike the present situation, the possessors' claim of title relied not upon an official recorded instrument but solely upon the location of a private fence line erroneously placed by their grantor.

In *Beasley v. Konczal*, 87 Wis. 2d 233, 275 N.W.2d 634 (1979), the possessor did rely upon a deed drawn in relation to an official recorded plat. However, the *Beasley* court rejected the plat as record evidence of the disputed boundary because the plat on its face did not purport to establish the disputed boundary line. *Id.* at 239, 275 N.W.2d at 638–39. In the present case, Graham's survey did establish the disputed line between Government Lots 8 and 9.

■

Previous reference was made to another discrepancy in the Harding survey. Curtis concedes that there is a distinction between the west boundary of Government Lot 8 as surveyed by Graham in 1915 and as surveyed by Harding. Harding used only the concrete monument on the north terminus of the Graham line and did not physically locate the concrete monument at the south quarter-corner in order to establish the west line of Lot 8. Instead, he accepted an iron pipe found in place some 108.5 feet south of the town road, based on materials furnished him by the former owner, Pride. Harding's line

varies from the Graham line by nearly forty degrees, creating a fugitive triangle of real estate with the concrete monument as its apex and the town road as its base. In this respect, Harding's survey comports with neither the Graham survey nor Inman's "true" survey as found by the trial court. It therefore fails to create "claim of title" in the disputed triangle. *See id.* The trial court's ruling to the contrary is therefore reversed and remanded to permit a determination whether Curtis is entitled to equitable relief regarding this land and to amend the final judgment in conformity with this decision and the ultimate ruling regarding other remedies.

The trial court also found Harding negligent in conducting his survey of the disputed lands, and imposed upon him the reasonable costs and attorney fees incurred by the defendants in this action. This is in accord with the rule established in *Weinhagen v. Hayes*, 179 Wis. 62, 65, 190 N.W. 1002, 1003 (1922):

> The general rule is that costs and expenses of litigation, other than the usual and ordinary court costs, are not recoverable in action for damages, nor are such costs even recoverable in a subsequent action; but, where the wrongful acts of the defendant have involved the plaintiff in litigation with others, or placed him in such relation with others as to make it necessary to incur expense to protect his interest, such costs and expense should be treated as the legal consequences of the original wrongful act.

Harding points to extensive evidence that other surveyors commonly relied upon Graham's monuments, including Inman himself on other occasions. Harding also produced expert testimony that his actions were within professional standards as they existed in 1971.

Harding concedes his negligence with respect to the small triangular piece of land previously described. Harding argues, however, that Inman's testimony regarding Harding's negligence in following the Graham survey is not credible especially in view of his own reliance upon Graham's monuments on other occasions. We conclude that even if Inman relied upon Graham's monuments on other occasions, that may be evidence of his own negligence, but does not render his testimony inherently incredible. When the trial court acts as the finder of fact, it is the ultimate arbiter of credibility of witnesses, and where there is a conflict in the testimony, or more than one reasonable inference may be drawn, the appellate court is obliged to support the finding made by the trial court. *Onalaska Elec. Heating, Inc. v. Schaller,* 94 Wis. 2d 493, 501, 288 N.W.2d 829, 833 (1980). We apply this standard of review to Inman's testimony in this case.

The court denied Ivalis' similar request for costs and fees from Harding based upon a failure to plead and prove such a claim at trial. It is within the trial court's discretion to permit or refuse an allegation of a new cause of action to conform with the proof, and unless there is an erroneous exercise of that discretion, the trial court's decision will not be disturbed. *Troy Co. v. Perry,* 68 Wis. 2d 170, 178, 228 N.W.2d 169, 173 (1975). Harding opposed Ivalis' motion to amend on grounds that he would have pursued discovery and trial strategy regarding Ivalis' own negligence and other factors had he been aware of such a claim. The trial court did not exceed its discretionary powers in denying the amendment.

*By the Court.* —Judgment affirmed in part; reversed in part and cause remanded with directions. Costs to defendants.