CHANDELLE ENTERPRISES, LLC,
Plaintiff-Appellant,

v.

XLNT DAIRY FARM, INC.,
Defendant-Respondent.†

Court of Appeals

*No. 2004AP2423. Submitted on briefs March 14, 2005.
—Decided April 26, 2005.*

2005 WI App 110

(Also reported in 699 N.W.2d 241.)

† Petition to review denied 10-3-05.

808

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Steven J. Swanson* of *Swanson Law Office* of St. Croix Falls.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Gary L. Antoniewicz* of *Boardman, Suhr, Curry & Field, LLP* of Madison.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J. Chandelle Enterprises, LLC appeals a judgment denying its action for ejection, and establishing the northern boundary line of the "NW¼ of the S/E¼, Section 26" as the fence line that runs east-west between that quarter section and a section owned by XLNT Dairy Farm.[1] Chandelle argues that neither of the equitable doctrines the trial court might have relied on—acquiescence or reformation under Wis.

---

[1] XLNT, a Wisconsin corporation, is owned by Curtis Lumsden.

STAT. § 847.07[2]—apply to the facts in this case. Thus, Chandelle contends, there was no legal basis for the court's decision. We agree and reverse the judgment.

## Background

¶ 2. Most of the relevant facts in this case are not disputed. In 1985, Marvin Pilgrim died. In 1987, the personal representative of Pilgrim's estate, Gordon Peterson, sold XLNT several properties in Polk County, including the "SW¼ of the NE¼, Section 26, Township 34 North, Range 18 West." Prior to the sale, XLNT had farmed that quarter for a number of years under a lease with Pilgrim. In 1988, Peterson sold the "NW¼ of the SE¼, Section 26, Township 34 North, Range 18 West, except Lot 1 of the Certified Survey Map No. 1286" to Ervin Hansen. These two quarters share a north-south border that runs the full east-west width of the forty-acre parcels. A fence line also runs the east-west width of the parcels in question.

¶ 3. When Peterson sold the quarters, he believed that fence line marked the actual boundary line between them and, as he testified at trial, he told both XLNT and Hansen that the fence was the boundary. In 1989, Hansen had Wayne Swenson survey his quarter and discovered that the fence line was actually located forty-five to sixty-nine feet south of the true "forty line." According to the survey, the fence was thus on Hansen's land and the true boundary was north of the fence. Hansen took no action against Pilgrim's estate and apparently never informed XLNT about the discrepancy. XLNT had farmed the land on its side of the fence up to

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

the fence line throughout the years it had leased the property and continued to farm to the fence line after 1989.

¶ 4. In 1991, Hansen sold his quarter—"the NW¼ of the SE¼" of Section 26—to William and Jo Krager, who later transferred title to Chandelle, a limited liability company they owned. In 2003, Chandelle asked Swenson to survey the property to establish its boundaries. Swenson again located the boundary line between the XLNT quarter and the Chandelle quarter, north of the old fence line. Swenson testified that land records showed that the county surveyor had remounted an "obliterated" east quarter corner marker in 1979.[3] Based on the remounted quarter marker, Chandelle has

---

[3] The county surveyor recorded his work in a "Certified Land Corner Restoration." That document noted that the surveyor had located the monument based on "the best available evidence." It also noted that the monument did not fit in with the "apparent ¼ line fence to the west," the fence line between the quarters in this case. Wisconsin courts have recognized the difference, established by the General Land Office, between lost and obliterated corners. An obliterated corner is one where no visible evidence remains of the original surveyor's work but where the location of the corner "may, however, have been preserved . . . by acts of landowners, and by the memory of those who knew . . . the true situs of the original monument." *Fehrman v. Bissell Lumber Co.*, 188 Wis. 82, 87–88, 204 N.W.582 (1925). If the location is ascertainable based on any or all of those things, the corner is not lost.

Beginning on January 1, 1970, and continuing each year, county surveyors or deputies were authorized to "check and establish or reestablish and reference at least 5% of all corners originally established in the county by government surveyors, so that within 20 years or less all the original corners will be established or reestablished and thereafter perpetuated." Wis. Stat. § 59.74(2)(i).

811

title to approximately 1.81 acres of land located on the XLNT side of the fence.[4]

¶ 5. Chandelle brought an action for a declaratory judgment establishing the true boundary line as the one located by Swenson rather than the fence line. XLNT counterclaimed, arguing that the boundary should remain the fence line based on equitable doctrines of adverse possession, acquiescence, and reformation of the deeds to express the true intentions of the buyers and sellers. After a bench trial on March 18, 2004, the trial court ruled that XLNT could not prove adverse possession because it had not occupied the property in question for twenty years.[5] The court also concluded "the evidence seems clear that whenever a transfer of real estate took place everyone considered and accepted the fence line as the boundary line." In its July 2004 Order and Judgment, the trial court granted XLNT's "counterclaim for possession and title ... based upon the Court's equitable powers to reform deeds . . . ." Chandelle now appeals.

### Discussion

¶ 6. The issue before us therefore is whether the trial court erred when it declared the fence line the boundary line between the Chandelle and XLNT quar-

---

[4] There is also no dispute that, leaving aside the contested land, XLNT's quarter is less than forty acres because its north-south length is less than the usual 1320 feet. Although quarter sections are commonly "short" because of easements for roads and similar uses, testimony at trial suggested that this error probably dated back to the original government survey in 1848.

[5] This ruling is not challenged on appeal; XLNT now concedes it cannot show adverse possession under WIS. STAT. § 893.25.

ters based either on the doctrine of acquiescence or its equitable power to reform deeds to correct a mutual mistake.[6]

## The Doctrine of Acquiesence

¶ 7. At first blush, fairness and the equitable doctrines associated with it would appear to dictate that a fence long accepted as the boundary between two properties should become the true boundary line. However, Chantelle argues that the equitable doctrine of acquiescence cannot apply because extrinsic evidence showing that the parties believed the fence line was the true boundary line is not admissible in this case. We agree.

¶ 8. The doctrine of acquiescence is "a supplement to the older . . . rule of adverse possession which held that adverse intent was the first prerequisite of adverse possession . . . . The harsh result of this rule soon became apparent . . . and courts began to hold that land could be acquired by adverse possession . . . if the true owner acquiesced in such possession for a period of twenty years." *Buza v. Wojtalewicz*, 48 Wis. 2d 557, 562–63, 180 N.W.2d 556 (1970). The doctrine thus ameliorates the rule of adverse possession by allowing mutual acquiescence to substitute for adverse intent.

¶ 9. The general outline of this doctrine became part of Wisconsin law in the nineteenth century. During the twentieth century, however, courts expanded the doctrine by crafting exceptions to the requirement of a

---

[6] The court's written findings of fact and conclusions of law suggest its ruling was based on the doctrine of acquiescence. Its written decision and order indicate it relied on reformation.

twenty-year period of acquiescence. *Thiel v. Damrau,* 268 Wis. 76, 81–84, 66 N.W.2d 747 (1954), establishes the exception XLNT relies on:[7]

> [W]here adjoining owners take conveyances from a common grantor which describe the premises conveyed by lot numbers, but such grantees have purchased with reference to a boundary line then marked on the ground, such location of the boundary line so established by the common grantor is binding upon the original grantees and all persons claiming under them, *irrespective of the length of time which has elapsed thereafter.*

*Id.* at 81 (emphasis added).

■

¶ 10.　Our supreme court's authority for this exception is a New York case, *Herse v. Mazza,* 91 N.Y.S. 778 (1904). *Herse*[8] determined that the actual location "with reference to which the parties contracted and

---

[7] Wisconsin recognizes several fence-related exceptions to the rule that acquiescence, like adverse possession, requires twenty years to establish. Where there is a dispute over the location of a boundary line, for example, and adjacent owners agree to a line and build a fence to memorialize their agreement, the location of the fence establishes the boundary even if the period of acquiescence is less than twenty years, *see, e.g., Rottman v. Toft,* 187 Wis. 558, 204 N.W.585 (1925). A fence built in reliance on a survey and acquiesced in by neighbors over "a period of years" is prima facie evidence establishing the fence is the true boundary line where there is no competent evidence showing the true boundary line to be different from the fence line. *See Nagel v. Philipsen,* 4 Wis. 2d 104, 110, 90 N.W.2d 151 (1958). However, neither of those exceptions applies to the facts of this case.

[8] The property in *Herse* was described in deeds simply as Lot 45, 46, etc., in block 83. *See Herse v. Mazza,* 91 N.Y.S. 778, 779 (1904). The blocks and lots referred to were represented on

took their titles" controlled and was "conclusive . . . of the true location" of the disputed boundary line. *Id.* at 779. *Herse* did not presume, however, that the parties agreed on a different boundary than the deed boundary, but rather that they had correctly found and located the true boundary and subsequently took title under deeds that described that boundary. *Id.* The line established by the original marks on the ground, the stakes, "is presumably the line mentioned in the deed;" the location does not rest "upon acquiescence in an erroneous boundary but upon the fact that the true location was made and the conveyance made in reference to it." *Id.* at 780. However, we do not get to the *Herse* exception if the description in the deed "is definite, certain and unambiguous." *See Buza*, 48 Wis. 2d at 566 (citation omitted). The location of any marker is admissible extrinsic evidence only if "the location of the boundary line was not described in the deed." *Id.*

¶ 11. *Thiel* adopted *Herse*'s conclusions in a· case in which the deed descriptions, also by lot numbers, were ambiguous.[9] *Buza* made it clear, however, that the exception from the twenty-year acquiescence period did not apply when a conveyance was by metes and bounds because the descriptions in that case were not ambiguous. *Buza*, 48 Wis. 2d at 566. "If everyone had occupied

a map made in 1835. *See id.* The map gave no distances as to the width or length of lots, however, which meant it was impossible "to ascertain by measurement on the map . . . widths or lengths with sufficient accuracy to permit precise location of lines on the ground." *Id.*

[9] Though *Thiel* focuses on the common grantor section of the rule, the supreme court clearly adopts the entire *Herse* framework. *Thiel v. Damrau*, 268 Wis. 2d 76, 81–82, 66 N.W.2d 747 (1954).

from the true forty line, as the deeds directed them to do, there would have been no dispute." *Id.* If parties acquiesce in "a wrong boundary, when the true boundary can be ascertained from the deed, it is treated both in law and equity as a mistake and neither party is estopped from claiming to the true line." *Hartung v. Witte,* 59 Wis. 285, 299, 18 N.W.175 (1884).

¶ 12. The form of the description is, in other words, significant only to the extent a description in the deed or conveying document is ambiguous or unambiguous. The primary source of the intent of the parties is what they wrote within the four corners of the deed and "parole evidence to vary the terms of a written instrument, or to show an intention contrary to that disclosed upon its face, is not competent, unless there is ambiguity in the instrument." *See Elofrson v. Lindsay,* 90 Wis. 203, 205, 63 N.W. 89 (1895). Only where the description in a deed is "uncertain and doubtful," therefore, can the court look to extrinsic evidence of location and possession to show intention. *See id.*

¶ 13. To support its claim that the doctrine of acquiescence applies to the facts in this case, XLNT cites *Nagel v. Philipsen,* 4 Wis. 2d 104, 90 N.W.2d 151 (1958). However, *Nagel* deals with a different exception to the twenty-year rule, with a fence built after a survey and in reliance on it. *Id.* at 110. More importantly, there is no evidence that *Nagel* alters the prerequisite for employing extrinsic evidence—ambiguity in the deed.

¶ 14. Early Wisconsin case law indicates state courts saw nothing ambiguous about descriptions by quarter section. In 1854, the supreme court found there was "no difficulty" in ascertaining the premises intended to be conveyed where the section, town and range were correct and the instrument inadvertently

substituted northwest quarter for southeast quarter. *Thompson v. Jones*, 4 Wis. 124, 129–30 (1854). Ten years later, the supreme court similarly found that monuments established by government surveys and implicitly referenced by quarter section description were sufficient, in the absence of error, to ascertain boundaries of land. *Prentiss v. Brewer*, 17 Wis. 2d 656 (1864). However, the dispositive question here is not whether descriptions by quarters are more like descriptions by metes and bounds than descriptions by lots, but whether the true boundary line could have been determined by the descriptions in the XLNT and Chandelle deeds.

¶ 15. According to the abstract of title, the land descriptions in the Chandelle and XLNT deeds are identical to those used in the first conveyances in the 1850s. They are based on United States government surveys, which established section and quarter corners in Wisconsin. *See Ivalis v. Curtis*, 173 Wis. 2d 751, 756, 496 N.W. 2d 690 (Ct. App. 1993). The original surveys used methods fixed by statute[10] and the corners so established were presumed accurate (although that presumption was rebuttable). *See, e.g., id.* at 757. Wisconsin later authorized perpetuation of section quarters; the landmarks established under the statute presumptively mark the section and quarter section corners as originally established by the United States. *See id.* at 756 (citing WIS. STAT. § 827a, 828, 829, 829o and 829p; WIS. STAT. ch. 39 (1915)).

---

[10] Federal statutes required north and south sections to run north and south on the true meridian, for example, unless the lines marked and corners fixed by the surveyors on the ground contradict that presumption. *Gerhardt v. Swaty*, 57 Wis. 24, 31, N.W. 851 (1883).

¶ 16. Using the terms of the original conveyances, the Chandelle and XLNT deeds describe whole forties, or quarter sections, not smaller or irregular fractions of such sections. The method for establishing boundary lines based on such descriptions is well-established. *See, e.g., Prentiss,* 17 Wis. at 661 (describing the system of surveys and the rules for establishing monuments and corner markers). Indeed, the fact that a surveyor, using the deeds, has established·what the parties agree is the true boundary line demonstrates that the descriptions were sufficiently clear and definite. We thus conclude that because, in this case at least, the description by quarter section is not ambiguous, the doctrine of acquiescence does not apply.

### *Reformation and Mutual Mistake*

¶ 17. Chandelle argues alternatively that the trial court erred if it based its decision on its equitable power to reform deeds because this is not a suit between a buyer and a seller or between the original parties. XLNT responds that Chandelle did not raise this issue at trial[11] and that no precedent prohibits reformation in the absence of the original grantors and grantees. We are not persuaded.

---

[11] XLNT suggests that Chandelle cannot invoke the defense of failure to join a party unless such a defense was made at trial in a pleading or a motion. *See* Wis. Stat. § 802.06(2). But that suggestion misses the point. If Chandelle is an intervening party whose rights must be protected, equity would not be satisfied by a joinder of other parties. The equitable problem remains the same. Reformation will affect an innocent party whose rights accrued long after any mutual mistake. If XLNT means to argue, alternatively, that we cannot address an argument not raised at trial, that rule is one of judicial

¶ 18. Wisconsin courts have long recognized that a court in equity can reform written instruments that, by mutual mistake, do not express the true intentions of the parties. *See, e.g., Van Brunt v. Ferguson*, 163 Wis. 540, 545–46, 158 N.W.295 (1916). That authority is codified in, among other places, WIS. STAT. § 847.07, granting trial courts the power to order a conveyance corrected if the conveyance "contains an erroneous description, not intended by the parties to the conveyance." The party who seeks reformation must offer clear and convincing proof that both parties intended to make a different instrument and had agreed on facts that were different than those set forth on the instrument. *See, e.g., Kadow v. Aluminum Specialty Co.*, 253 Wis. 76, 78, 33 N.W.2d 236 (1948). It is an equally well-known and widely accepted principle, however, that courts will not reform if the rights of innocent third parties, such as bona fide purchasers or others who have acquired intervening rights who cannot be placed in "statu quo," are affected. *Holton State Bank v. Greater Milwaukee Food Merchants Ass'n*, 9 Wis. 2d 95, 100, 100 N.W.2d 322 (1960).

¶ 19. While XLNT is correct that no Wisconsin precedent specifically requires the original parties to be before the court, the presence of a party such as Chandelle, who has acquired intervening rights, is ordinarily enough to defeat reformation. *See, e.g., id.* In addition, it is not clear here what the mistake was or whether it was mutual. The original parties may have

administration and does not limit our power to address such arguments. *See Brown County v. DHSS*, 103 Wis. 2d 37, 42, 307 N.W.2d 247 (1981).

intended to buy and sell property to the fence line, but the deeds also demonstrate that they intended to buy forty acres as described in those documents. The deeds do not qualify the property descriptions by incorporating the alleged agreement that the north-south boundary is the fence line; if that was a mistake, it would have been construed against the party who drafted the conveyance. *See Hajec v. Novitzke,* 46 Wis. 2d 402, 410, 175 N.W.2d 193 (1970). If XLNT could have established by clear and convincing evidence that this was a mutual mistake with Pilgrim's estate, XLNT might therefore have been entitled to reformation.[12] But reformation now would affect rights acquired by Chandelle long after that transaction.

¶ 20. Evidence presented at trial suggests that Hansen, who is not a party to this action, suspected that the fence line was not the true boundary line. Chandelle's owners did not testify at trial so there is no way to determine what they intended. In any case, a mistake between Hansen and Chandelle would be between those parties, and any argument for reformation would have to focus on their intentions. While we recognize that this is a case in which more than one person made more than one mistake, that fact does not establish a mutual mistake in the legal sense between

---

[12] The owner of XLNT admitted at trial that he had some notice, in 1977 or 1978, that his quarter was short, from a government employee who told him that, based on an aerial photograph, he was short eight rods. He also testified that Chandelle's owner had approached him soon after buying his land, in the nineties, to inform him that there was a problem with the boundary line. However, XLNT never had the land surveyed to establish its true borders and apparently continued to pay taxes on a forty-acre quarter.

the parties to this action. A mistake is only mutual if it is reciprocal and common to both parties. *See, e.g., Jentzsch v. Roenfanz*, 185 Wis. 189, 193, 201 N.W. 504 (1924).

¶ 21. Because we conclude that, under the facts in this case, neither the doctrine of acquiescence nor equitable reformation provides a basis for the trial court's decision to give XLNT title to 1.81 acres that belongs to Chandelle, we reverse.

*By the Court.*—Judgment reversed.