In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1839

ROBERT W. FELLAND,

*Plaintiff-Appellant,*

*v.*

PATRICK CLIFTON, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 10-cv-664-slc—**Stephen L. Crocker,** *Magistrate Judge.*

ARGUED SEPTEMBER 15, 2011—DECIDED JUNE 6, 2012

Before FLAUM, MANION, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. While vacationing in Arizona, Robert and Linda Felland entered into a contract to purchase a condominium unit in a planned beachfront development in Puerto Peñasco, Mexico. The project was managed by a real-estate development firm owned by Patrick Clifton, an Arizona resident. Robert Felland signed an agreement that required the couple to make a down payment in three installments. After

making the first installment payment, the Fellands became concerned about the financing and timeliness of the project and sought reassurance from Clifton that the unit would be delivered on schedule. Clifton sent several communications—emails, phone calls, and letters—to the Fellands at their home in Wisconsin assuring them the project was properly financed and would be completed on time, and encouraging the Fellands to pay the additional installments on the down payment. Relying on these assurances, they made the payments. Clifton sent additional communications describing the project's progress, but did not deliver the unit by the contractual deadline. Further inquiry by the Fellands' attorney revealed that the project did not have financing; instead, advance sales of condominium units were funding the development.

Robert Felland sued Clifton in Wisconsin state court alleging intentional misrepresentation and seeking rescission and damages. Clifton removed the case to federal district court and moved to dismiss for lack of personal jurisdiction. The district court granted the motion, finding that Clifton's communications to the Fellands in Wisconsin did not satisfy the due-process minimum-contacts requirement for personal jurisdiction. Felland appealed.

We reverse. Felland's complaint alleges that Clifton's repeated communications to his Wisconsin home were part of a deliberate attempt to lull him into a false sense of security and to induce him to make the installment payments. While these communications might not be directly relevant to a simple breach-of-

contract claim, they are critical to Felland's claim of intentional misrepresentation. Clifton was aware that Felland lived in Wisconsin, directed multiple communications to him there, and knew that the harm would be felt in Wisconsin. These allegations are sufficient to establish the minimum contacts necessary to satisfy the due-process requirements for jurisdiction over Clifton in Wisconsin. We also conclude that Clifton's communications satisfy the "local act or omission" provision of the Wisconsin long-arm statute.

## I. Background

This case comes to us from a jurisdictional dismissal, so we take the following facts primarily from the complaint and its attached exhibits. The Fellands live in Three Lakes, Wisconsin. Clifton is a resident of Scottsdale, Arizona, and owns Clifton Meridian LLC, a real-estate development firm based in Scottsdale and organized under Arizona law. He also owns CM La Perla de Peñasco, S. De R.L. De C.V. ("CM La Perla"), a corporation organized under the laws of Mexico that specializes in building beachfront residential projects in northern Mexico.

In 2005 Clifton and Clifton Meridian began a luxury high-rise condominium project called La Perla del Mar in Puerto Peñasco, Mexico, a beachfront community about 30 miles from the Arizona border. Clifton formed CM La Perla to serve as owner of the property on which the La Perla Project would be built and to maintain an on-site sales office staffed by Clifton Meridian employees.

In February 2006, while the Fellands were vacationing in Arizona, they traveled to Puerto Peñasco to tour the La Perla Project's model unit. They met with Jon Puckett, Clifton's sales representative, to whom they provided their Wisconsin mailing address, telephone number, and email address. The Fellands were told that construction would begin in a few weeks and should be completed by early 2008, but they were not told that Clifton had yet to secure construction financing or that the start of construction was contingent upon the sale of additional units. On February 23, while on the development site in Mexico, Robert Felland signed a "Reservation of Unit" form, which noted his Wisconsin address and phone number, and he paid a refundable $5,000 deposit. Felland was told he would eventually need to sign a type of contract under the laws of Mexico called a Promise of Trust Agreement ("PTA").

Felland returned to Puerto Peñasco in March 2006 to sign the PTA. The agreement stated that CM La Perla was represented by Patrick Clifton, but Clifton himself did not sign the form at this time. It further provided that Felland's unit would be delivered no later than January 31, 2009, and that failure to deliver by this date would entitle Felland to reimbursement of all money previously paid to CM La Perla. The purchase price for Felland's unit was $680,000, and the PTA required a 30% down payment of $204,000, payable in three installments of $68,000 over 90 days. Having already paid $5,000, Felland tendered a check for an additional $63,000 with the signed PTA. He was told that a fully executed copy of the PTA would be mailed to him once Clifton had signed it.

The next installment was due on April 10, 2006, but by this time the Fellands had become concerned about the La Perla Project because they had not received a counter-signed copy of the PTA or a receipt or verification of their first payment. Linda Felland emailed Puckett expressing these concerns, noting that her husband was "talking about canceling" the purchase and seeking assurance that the project was on schedule. Puckett responded by email, indicating that the developer "was sending out the countersigned PTA ASAP." He assured her that "this is a great project and has huge appreciation potential," and noted that "I have 168K of my personal money invested in unit 801[.] I would not sell something that I am not invested in." Soon after this email, Clifton mailed the signed PTA and a receipt to the Fellands at their Wisconsin address. Relying on these documents and Puckett's email, the Fellands pro-ceeded with the additional down payments by sending two checks for $68,000, one on April 12 and the other on May 7, 2006. They received receipts for these payments by regular mail on April 20 and June 2, 2006, respectively. Throughout 2006 and 2007, the Fellands also received about six telephone calls to their Wisconsin home from Clifton Meridian employees regarding various aspects of the project; some of these calls were made before the Fellands paid the full down payment. In a declaration submitted in response to Clifton's motion to dismiss, Robert Felland attested that he would not have paid the series of installments on the down payment had he not received Puckett's reassurance about the project, the contract documents, and written receipts.

After the Fellands had paid the full down payment, Clifton Meridian continued to send them numerous communications on the status of the La Perla Project, both by email and regular mail. For example, in July 2006 Puckett sent an email to Linda Felland indicating that groundbreaking would begin that August with completion targeted for mid-2008. And in November 2006 Jason Silkey, Clifton Meridian's Director of Development, sent an email indicating that "[e]xcavation work continues on schedule at the site" and inviting owners to view the progress on the project's website. Clifton also contacted the Fellands by certified mail in March 2008, noting some problems with the project's financing but expressing optimism that a commitment could be secured with a new lender in short time. Overall, between May 11, 2006, and February 20, 2009, Clifton and his associates sent the Fellands 22 emails[1] and two mailed messages. These updates were essential to Felland's continued confidence in the La Perla Project; without them he would have backed out of the purchase and demanded a refund of his down payment.

Clifton did not deliver the unit by the promised January 31, 2009 date. On February 10, 2009, Clifton sent an email to unit owners addressing the delays in the development and threatening "punitive legal action" against anyone who might "sabotage our financing attempts

---

[1] Many of these emails were addressed generally to "Friends of *La Perla del Mar*" and appear to have been sent to multiple recipients.

by organizing some type of legal action against the project":

> Unfortunately I must be very clear about the following: if anyone, I don't care who they are, engages in any activities to deliberately sabotage our financing attempts by organizing some type of legal action against the project or spread malicious and false lies about the project or developer I will assure you that we will take immediate and punitive legal action against the party or parties at fault.

After receiving this email, the Fellands sought legal advice, and on February 18, 2009, their attorney contacted Clifton demanding a refund of their $204,000 down payment. Clifton refused, and subsequent investigation revealed that Clifton did not have financing for the La Perla Project when Felland signed the PTA and that advance sales of condominium units were funding the project.

On June 1, 2010, Robert Felland filed this lawsuit in the Oneida County Circuit Court naming as defendants Patrick Clifton, Clifton Meridian LLC, and CM La Perla (collectively, "Clifton"). Felland sought rescission of the contract and damages, alleging that Clifton had committed a series of intentional misrepresentations. In particular, Felland asserted that Clifton concealed the development's financing difficulties from the beginning and that Clifton's later communications were made in furtherance of a scheme to defraud the Fellands out of their down payment.

Clifton removed the suit to federal court in the Western District of Wisconsin, and the parties consented to proceed

before a magistrate judge. *See* 28 U.S.C. § 636(c)(3). Clifton moved to dismiss for lack of personal jurisdiction. The judge granted the motion, holding that Clifton had insufficient contacts with Wisconsin to satisfy the requirements of due process. In reaching this decision, the judge disregarded most of the communications Clifton and his employees sent to Felland in Wisconsin, concluding that the "alleged misrepresentations upon which Felland relied to his detriment were made in Mexico." Having concluded that Clifton did not have the minimum contacts with Wisconsin necessary to satisfy the requirements of due process, the judge did not consider whether the claim fell within the terms of Wisconsin's long-arm statute.

## II. Analysis

We review a dismissal for lack of personal jurisdiction de novo. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). The plaintiff bears the burden of establishing personal jurisdiction, but where, as here, the issue is raised on a motion to dismiss, the plaintiff need only make a prima facie showing of jurisdictional facts. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). We therefore accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff. *Id.*

No federal statute authorizes nationwide service of process in this case, so personal jurisdiction is governed by the law of the forum state. FED. R. CIV. P. 4(k)(1)(A);

*see also Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 760 (7th Cir. 2008). The court's exercise of jurisdiction over the defendant must be authorized by the terms of the forum state's personal-jurisdiction statute and also must comport with the requirements of the Fourteenth Amendment's Due Process Clause. *Tamburo*, 601 F.3d at 700. Here, the district court addressed only the due-process question, dismissing the case on this ground alone. Because we are reversing this decision, we must also address whether the court's exercise of personal jurisdiction is authorized by Wisconsin's long-arm statute. The due-process question is the more complicated of the two; once the due-process predicates are found to exist, the statutory question becomes quite straightforward.

## A.  Due Process

For a court to exercise personal jurisdiction over an out-of-state defendant, the key issue for constitutional purposes is whether the defendant has sufficient "minimum contacts" with the forum state such that "the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Tamburo*, 601 F.3d at 701 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Each defendant must have "purposely established minimum contacts with the forum state such that he or she 'should reasonably anticipate being haled into court' there." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). Jurisdiction cannot be avoided simply because a defendant did not physically enter

the forum state, *Burger King*, 471 U.S. at 476, but we have also said that "[p]otential defendants should have some control over—and certainly should not be surprised by—the jurisdictional consequences of their actions," *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997).

Personal jurisdiction may be either general or specific. Where a defendant has "continuous and systematic" contacts with a state, that defendant is subject to general jurisdiction regarding any action, even actions unrelated to those contacts. *Tamburo*, 601 F.3d at 701. But the threshold for general jurisdiction is quite high because "the contacts must be sufficiently extensive and pervasive to approximate physical presence." *Id.* (citing *Purdue Research Found.*, 338 F.3d at 787 n.16). The facts here clearly do not give rise to general jurisdiction, and Felland does not suggest otherwise.

Unlike general personal jurisdiction, a court's exercise of specific jurisdiction requires that the defendant's contacts with the forum state relate to the challenged conduct. There are various formulations of the standard for establishing specific personal jurisdiction, but they may be condensed to three essential requirements: (1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state, *Burger King*, 471 U.S. at 472; (2) the alleged injury must have arisen from the defendant's forum-related activities, *id.*; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice, *Int'l Shoe*, 326 U.S. at 316. *See also Tamburo*, 601 F.3d at 702; *Purdue Research Found.*, 338 F.3d at 780-81.

### 1. *Conduct "purposefully directed" at the forum state*

The heart of this dispute is whether Clifton's multiple communications to the Fellands in Wisconsin are properly characterized as actions "purposefully directed" at the forum state with regard to the alleged fraudulent scheme. Clifton argues (and the district court held) that any misrepresentations by Clifton occurred in Mexico and Arizona, and that to the extent the copy of the PTA that Clifton sent to the Fellands in Wisconsin contained misrepresentations, it was merely the same information Felland had already been given in Mexico. The judge further held, and Clifton reiterates here, that the other communications to the Fellands in Wisconsin—many of which occurred after they had paid the full down payment—are irrelevant to the intentional-misrepresentation claim. By contrast, Felland argues that the emails, letters, and phone calls directed to his Wisconsin address—both before and after he paid the full down payment—continuously misled him regarding the progress of the La Perla Project, induced him to make the installment payments on the down payment, and convinced him not to cancel his purchase when he otherwise might have.

We note at the outset that the nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue. For example, personal jurisdiction in a breach-of-contract suit generally turns on whether the defendant purposefully availed himself of the privilege of conducting business in the forum state. *See, e.g.*, *Tamburo*, 601 F.3d at 702;

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). So if Felland had brought only a breach-of-contract claim, the analysis would likely be limited to Clifton's conduct during contract formation in Mexico. *See RAR*, 107 F.3d at 1278 ("[I]n a breach of contract case, it is only the 'dealings *between the parties in regard to the disputed contract*' that are relevant to mini-mum contacts analysis." (quoting *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 153 (3d Cir. 1996))). Clifton never advertised in Wisconsin, nor did he or any of his associates conduct any actual business there, so the exercise of personal jurisdic-tion would probably not be appropriate had Felland brought only a breach-of-contract claim.

But of course, the crux of Felland's complaint is not (or not just) Clifton's failure to deliver the condominium unit by the promised date. Instead, Felland alleges that Clifton engaged in a continuous fraudulent course of conduct—including the repeated communications sent to his home in Wisconsin—in a knowing and deliberate attempt to cover up the La Perla Project's lack of financing, to deceive him regarding the status of the development, and to induce him to make the remaining installment payments on his down payment and not to cancel the purchase.

Under Wisconsin law a claim of intentional misrepresen-tation has the following three elements: (1) the defendant made a false representation of fact; (2) the false representa-tion was made with the intent to defraud and for the purpose of inducing another to act on it; and (3) the

plaintiff relied on the representation to his or her detriment. *Korhumel Steel Corp. v. Wandler*, 600 N.W.2d 592, 596 (Wis. Ct. App. 1999) (citing *Lundin v. Shimanski*, 368 N.W.2d 676, 680-81 (Wis. 1985)). The district court characterized Felland's decision to bring a fraud claim instead of a contract claim as a "tactical maneuver," but tactical or not, the tort-vs.-contract distinction is highly significant to the personal-jurisdiction analysis. Where a plaintiff's claim is for an intentional tort, "the inquiry focuses on whether the conduct underlying the claim[] was purposely directed at the forum state." *Tamburo*, 601 F.3d at 702 (citing *Dudnikov*, 514 F.3d at 1071).

We explained in *Tamburo* that the Supreme Court's important decision in *Calder v. Jones*, 465 U.S. 783 (1984), provides useful contours in conducting the purposeful-direction analysis in a tort case. In *Calder* the Court held that a California court could exercise personal jurisdiction over a reporter and editor for the *National Enquirer*, Florida residents who had written and edited an allegedly libelous article concerning an actress who was a California resident. *Id.* at 785-86. The Court turned aside the defendants' arguments that they were not responsible for the tabloid's distribution in California and had no stake in its publication there, holding instead that their intentional and allegedly tortious actions were expressly aimed at California. *Id.* at 789. Our opinion in *Tamburo* distilled three requirements from *Calder* for determining whether conduct was "purposefully directed" at the forum state: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that

the effects would be felt—that is, the plaintiff would be injured—in the forum state." 601 F.3d at 703. If the plaintiff makes these three showings, he has established that the defendant "purposefully directed" his activity at the forum state.

The first and third requirements of *Calder* are fairly easily met in this case. As alleged in the complaint, Clifton's communications were intentional misrepresentations under Wisconsin law, which suffices to establish "intentional and allegedly tortious conduct[2]." Likewise, there is no doubt that Clifton knew the alleged harm would be felt in Wisconsin. Clifton and his associates knew from the beginning that the Fellands were Wisconsin residents; their Wisconsin residency was noted in various documents possessed and signed by Clifton, and Clifton directed multiple communications via several different media to the Fellands' Wisconsin home.

The main disagreement here concerns the second requirement from *Calder*—whether Clifton's conduct was

---

[2] We explained in *Tamburo* that the circuits are divided on whether *Calder*'s "express aiming" inquiry includes all of the defendant's jurisdictionally relevant intentional acts or only those intentional acts that are also alleged to be tortious or otherwise wrongful—in essence, "intentional" vs. "intentional and allegedly tortious" acts. *Tamburo v. Dworkin*, 601 F.3d 693, 704 (7th Cir. 2010) (citing cases). We did not need to take sides in the split in *Tamburo,* and the same is true here. Felland's allegations are sufficient even under the narrower formula focusing only on the defendant's "intentional and allegedly tortious" acts.

"expressly aimed" at Wisconsin. On this point the district court made an analytical error. The court held that the only misrepresentations that counted were those that occurred prior to contract formation in Mexico; the judge thought that to the extent that the later communications contained misrepresentations, they were "too attenuated to support specific personal jurisdiction." Clifton defends this circumscribed focus on appeal, arguing that our inquiry is limited to the alleged misrepresentations that occurred prior to Felland's final down payment on May 7, 2006. Whatever tort was committed, says Clifton, was committed by this time, and the subsequent communications could not possibly give rise to the harm that Felland now alleges.

This argument views the fraud claim too narrowly. It may well be that the initial fraudulent conduct at issue here—namely, that Clifton concealed the lack of financing from Felland from the get-go—occurred in Mexico. But under Felland's theory of the case, the myriad additional communications to his Wisconsin address were part of a comprehensive and ongoing scheme to perpetuate this initial fraud. In essence, Felland is arguing that Clifton's repeated communications lulled him into a false sense of security, induced him to pay the installments on his down payment, and reassured him that there was no reason to cancel his purchase and demand a refund. It is well established that such "lulling" communications can be considered part of a larger scheme to defraud, even after the money itself was obtained. *See, e.g.*, *United States v. Brocksmith*, 991 F.2d 1363, 1367-68 (7th Cir. 1993); *United States v. Chappell*, 698 F.2d 308,

311 (7th Cir. 1983) ("Precedent has established that the use of the mails to 'lull' victims into a false sense of security may be 'for the purpose of executing' a scheme to defraud, even though the mailings were made after the money had been fraudulently obtained." (citing cases)). And such lulling communications are relevant to the evaluation of the defendant's minimum contacts with the forum state for purposes of establishing personal jurisdiction in a case alleging a fraud. *See Master Tech Prods., Inc. v. Smith*, 181 F. Supp. 2d 910, 912 (N.D. Ill. 2002) (denying a motion to dismiss for lack of personal jurisdiction where the defendant called the plaintiff in his home state *after* the defendant had allegedly tricked the plaintiff into disclosing confidential information, holding that the phone call "was in furtherance of the scheme to de-fraud").

Clifton argues that this case is distinguishable from *Master Tech* because the communications at issue here "did not lull Felland into thinking that his unit would be delivered on time." But whether Clifton's communications were *in fact* "lulling" communications that *did* deceive Felland is not important on a motion to dismiss for lack of personal jurisdiction. Felland alleges, and we must accept as true, that Clifton intentionally misrepresented important information about the progress and financing of the La Perla Project. He further alleges that his concerns about the development caused him to consider suspending his down payments, backing out of the deal, and demanding his money back, but that Clifton's letters, phone calls, and emails were crucial in assuring him that the project was proceeding as planned. His claim is not just

that Clifton intentionally misled him at the time he entered into the agreement in Mexico, but that Clifton engaged in an ongoing fraudulent scheme that included several letters, multiple phone calls, and almost two dozen emails, all to the Fellands' home in Wisconsin.[3] The point of these additional communications was to keep the installment payments coming and to forestall cancellation and a demand for a refund. Understood from this perspective, Clifton's ongoing misrepresentations were "expressly aimed" at Wisconsin; under the doctrine established in *Burger King* and *Calder*, Clifton's actions are properly considered as having been purposefully directed at the forum state.

2.  *Injury "arises out of" the defendant's contacts with the forum state*

Even where a defendant's conduct is purposefully directed at the forum state, the plaintiff must also show

---

[3] Of course, email accounts can generally be accessed in any state, so it may not make much sense to say that they were "sent to" a Wisconsin address. Nevertheless, Felland does note that these emails went through the computer server of his Wisconsin-based internet service provider. And more importantly, Clifton purposefully sent these emails to Wisconsin residents knowing that they would most likely be read and have their effect in Wisconsin. This manner of communication is similar to mailed letters or telephone calls, so the emails are properly considered as contributing to Clifton's minimum contacts with the forum state.

that his injury "arises out of" or "relates to" the conduct that comprises the defendant's contacts. *See Tamburo*, 601 F.3d at 708 (citing *Burger King*, 471 U.S. at 472). We noted in *Tamburo* that the Supreme Court has not elaborated on the details of this requirement, and the circuits have split on how close the causal connection must be; more specifically, the circuits disagree about whether the defendant's contacts must have been the *factual* cause of the plaintiff's injury, the factual *and* proximate cause, or perhaps some intermediate standard between the two. *See id.* at 708-09 (citing cases); *see also Dudnikov*, 514 F.3d at 1078 (outlining this conflict). We have suggested in passing that a mere "but for" causal relationship is insufficient to establish the required nexus between a defendant's contacts and the underlying cause of action, *see GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1025 (7th Cir. 2009) (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 322 (3d Cir. 2007)), but we have declined to definitively resolve the question, *Tamburo*, 601 F.3d at 709.

We do not need to decide the matter here because Felland's complaint is sufficient even under the strictest understanding of the "arising out of" requirement. Contrary to the district court's analysis, Felland's allegations are sufficient for more than mere but-for causation. We have already concluded that the communications at issue here were tortious misrepresentations expressly aimed at Wisconsin for the purpose of causing injury there. The communications were not just incidental but are central to the fraudulent course of conduct alleged in the complaint, and are sufficient as evidence of both

the factual and proximate cause of Felland's alleged injury. Felland's injury "arises out of" Clifton's contacts with Wisconsin.

### 3. *Traditional notions of fair play and substantial justice*

The final inquiry in the specific-jurisdiction analysis is whether the exercise of personal jurisdiction over an out-of-state defendant would offend traditional notions of fair play and substantial justice. *See Int'l Shoe*, 326 U.S. at 316. The following factors are relevant in making this determination: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (internal quotation marks omitted). Jurisdictional rules may not be employed in a manner that puts a defendant at a severe disadvantage, but "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. A party's concern that a forum is particularly unfair or inconvenient "usually may be accommodated through means short of finding jurisdiction unconstitutional." *Id.*

Clifton has not discussed this specific aspect of the jurisdictional analysis in any detail, and it received only passing attention from the district court. Applying the *Burger King* factors, we see no unfairness in permitting this suit to proceed against Clifton in Wisconsin. First, as is almost always the case, Wisconsin has a strong interest in providing a forum for its residents to seek redress for torts inflicted by out-of-state actors and injuries suffered within the state. Clifton does, of course, face some burden in being forced to defend an action in another state, but out-of-state defendants *always* face such a burden, and there is no suggestion that Clifton's hardship would be any greater than that routinely tolerated by courts exercising specific jurisdiction against nonresidents. And Felland might well face a heavier burden if forced to litigate out of state himself because the defendants are spread across two different jurisdictions, one of which is a foreign country. There is no compelling reason to assume that a single suit in Wisconsin would not be the most efficient means of resolving these claims.[4] *Cf. Tamburo*, 601 F.3d at 709-710 (concluding that a single suit in the plaintiff's home state would be the most efficient way to resolve a case with multiple defendants, one of whom resided in Canada).

---

[4] Although Clifton himself has not raised this point, we are sensitive to the possibility that he might be facing other lawsuits from similarly aggrieved purchasers. But even if Clifton faces the prospect of defending similar suits across multiple jurisdictions, there are other options to address this concern short of denying personal jurisdiction entirely. *See, e.g.*, 28 U.S.C. § 1404 (regarding change of venue).

The limited extent to which the district court addressed the specific question of fair play and substantial justice effectively merged this inquiry with the rest of the minimum-contacts analysis. For example, the judge suggested that it would be unfair to subject Clifton to jurisdiction in Wisconsin "simply because a Wisconsin resident happened to make a large purchase in Mexico." But for the reasons we have already discussed, the many communications that Clifton purposefully directed to Wisconsin—including those sent after Felland signed the PTA and paid the down payment—are properly part of the personal-jurisdiction analysis for a fraud claim like this one. The judge also noted that Clifton did not initiate the communications encouraging Felland to complete the installment payments, but that fact is irrelevant. Whether Clifton initiated them or not, under Felland's theory of the case, these communications were intentional misrepresentations directed at the forum state that caused the harm felt by residents there. Under these circumstances, Clifton could reasonably anticipate being haled into a Wisconsin court. Accordingly, the district court's exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. All the requirements of the Due Process Clause are met.

### B.  Wisconsin's Long-arm Statute

The district court did not address the question whether personal jurisdiction is authorized by Wisconsin's long-arm statute. Based on our conclusion that the requirements of due process are satisfied, the statutory issue is

easily resolved. Wisconsin's long-arm statute, WIS. STAT. § 801.05, has been interpreted to confer jurisdiction "to the fullest extent allowed under the due process clause." *Daniel J. Hartwig Assocs., Inc. v. Kanner*, 913 F.2d 1213, 1217 (7th Cir. 1990); *see also Kopke v. A. Hartrodt S.R.L.*, 629 N.W.2d 662, 668 (Wis. 2001) ("Wisconsin's long-arm statute is liberally construed in favor of jurisdiction."). Wisconsin courts often treat the personal-jurisdiction analysis as a two-step process, putting the statutory question before the constitutional one. *See Kopke*, 629 N.W.2d at 667-68. But that framework should not be taken to imply that the long-arm statute limits the exercise of personal jurisdiction any more than basic considerations of due process. To the contrary, the constitutional and statutory questions tend to merge; compliance with the Wisconsin long-arm statute creates a presumption that constitutional due process is satisfied, although the defendant of course has the opportunity to dispute personal jurisdiction on purely constitutional grounds. *Id.* at 671-72. Once the requirements of due process are satisfied, then there is little need to conduct an independent analysis under the specific terms of the Wisconsin long-arm statute itself because the statute has been interpreted to go to the lengths of due process.

Still, applying the long-arm statute, we have no trouble concluding that Felland has established a prima facie case for personal jurisdiction under the "local act or omission" provision, which authorizes jurisdiction "[i]n any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant." WIS. STAT.

§ 801.05(3). For the reasons we have already explained, Felland's complaint sufficiently alleges that Clifton's Wisconsin-directed communications were intentional misrepresentations designed to deceive the Fellands as to the progress and financing of the La Perla Project. This series of alleged misrepresentations amounts to a "local act" causing "injury to person or property within . . . this state"; it is well established that injury through mail or electronic communications satisfies section 801.05(3). *See, e.g.*, *Stein v. Ill. State Assistance Comm'n*, 535 N.W.2d 101, 105 (Wis. Ct. App. 1995) (affirming personal jurisdiction under section 801.05(3) where plaintiff had received several threatening letters from the defendant at his Milwaukee address).

Clifton relies on a line of cases holding that in some circumstances letters, telephone calls, or other communications sent from out of state are insufficient to satisfy the "local act or omission" provision of section 801.05(3). *Coté v. Wadel,* 796 F.2d 981 (7th Cir. 1986), is a representative example. *Coté* held that a handful of letters and phone calls between a Michigan attorney and a Wisconsin resident did not create personal jurisdiction for a malpractice suit against the attorney in Wisconsin. *Id.* at 984. But Felland does not claim, and we do not hold, that letters, phone calls, and emails *always* constitute "acts or omissions" under the Wisconsin long-arm statute, any more than such communications *always* establish minimum contacts for due-process purposes. The more precise question is whether the particular Wisconsin-directed communications at issue here were part of the wrongful conduct that forms the basis of the claim.

In *Coté*, for example, the handful of interstate communications between the parties were at best only tenuously connected to the conduct underlying the malpractice suit. The "act or omission" at the heart of the claim was the lawyer's failure to prosecute a case and failure to cooperate with another attorney, both of which took place entirely in Michigan. *Id.* Here, in contrast, Clifton's communications to Felland at his Wisconsin home are themselves a key component of Felland's claim for intentional misrepresentation. These communications satisfy section 801.05(3).

For the foregoing reasons, we REVERSE the district court's decision dismissing this case for lack of personal jurisdiction and REMAND for further proceedings consistent with this opinion.